Frank J. Sherman and Madeline E. Sherman v. Commissioner.
Sherman v. Commissioner
Docket No. 1335-63.
United States Tax Court
T.C. Memo 1965-126; 1965 Tax Ct. Memo LEXIS 205; 24 T.C.M. (CCH) 650; T.C.M. (RIA) 65126; May 11, 1965
Leonard Boreman Frick Bldg., Pittsburgh, Pa., for the petitioners. *206 Hobart Richey, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency in the income tax of petitioners for the taxable year 1960 in the amount of $905.65. Petitioners claim an overpayment of $2,157.10 in their petition, alleging that all amounts received from S. G. Yulke Company in 1960 are exempt from taxation. The only issue for decision is whether the petitioner, Frank J. Sherman, was a bona fide resident of India for an uninterrupted period including the entire taxable year 1960 and thus entitled to exclude from income all amounts received from the Yulke Company in that year under the provisions of section 911(a)(1) of the Internal Revenue Code of 1954. [1]
Findings of Fact Frank J. Sherman and Madeline E. Sherman are husband and wife now residing at 3405 Ridge Road, North Little Rock, Arkansas. They report their income on a cash basis. They filed their joint *207 Federal income tax return for the calendar year 1960 with the district director of internal revenue, Pittsburgh, Pennsylvania. Frank J. Sherman (hereafer called petitioner) is a mechanical engineer. After graduation from college, he worked for a firm of management consultants headquartered in Pittsburgh, Pennsylvania. Petitioner and his family lived in a home he owned in Wexford, Pennsylvania. In July 1958 petitioner answered an advertisement in the Wall Street Journal, run by the S. G. Yulke Company, Inc., New York, New York, a firm of management consultants engaging in international activities. Petitioner wanted to work abroad at this point in his career, and felt that he would be unable to do so if he waited much longer. When Yulke failed to contact him, petitioner joined the Henry Spen Company of Brooklyn, New York, as assistant general manager. He rented an apartment in Ozone Park, near Brooklyn, and moved his family there early in 1959. He did not sell his home in Wexford, but rented it. On May 5, 1959, Yulke entered into a contract with the United States International Cooperation Administration (ICA) for the establishment of an industrial training program in Rajkot, India, *208 sponsored jointly by the Governments of the United States and India. Under the contract Yulke was to perform the following services: The Contractor shall assist the Government in establishing and operating a Pilot Production and Development Center (hereinafter referred to as the "Center") as part of the Industrial Estate at Rajkot. The Contractor shall assist the Center in developing the manufacture of new products suitable for manufacture and marketability by existing industrial firms in the Rajkot Estate and by newly established firms in the Estate; advise the individual firms in the Estate in production problems; direct and train an Indian Staff in designing tools and equipment for the manufacture of products which are now being manufactured in the Estate and for the manufacture of new products; conduct training classes for the employees of the Estate firms in the principles of management, organization planning, product design, production planning, safety procedures, time and motion study, quality control and the technical specialities of each of the Contractor's Field Staff members. Emphasis shall be placed on the utilization of existing tools and equipment, domestic resources *209 and materials, and the local manufacture of hand tools and equipment. The program was to be staffed by a team of technicians in the following manner: The Contractor shall send to India the following personnel (hereinafter referred to as the "Field Staff") to perform services pursuant to this Article I for periods of approximately two years each, inclusive of travel time from their homes or regular places of business in the United States to India and return to points of origin by the most expeditious commercial air routes, or until the earlier termination of the Contract pursuant to Article V. 1. A Mechanical Engineer who will act as the Contractor's official representative in India and will be responsible for the supervision of all services performed by the Field Staff in India
2. A Foundry Technologist 3. A Machine Tool Technician 4. An Electroplating Technician 5. A Heat Treatment Technician 6. A Design Engineer The contract specified that Yulke would pay the "Field Staff" and that they would remain "employees" of the corporation. Yulke was also bound not to assign anyone to duty in India without prior written approval of the Government of India and ICA as to qualification *210 and approximate time in India. Yulke further agreed that it would, at the request of the Government of India or ICA, terminate promptly the assignment of any of its personnel whose general conduct was not satisfactory. Under the contract the corporation warranted that each member of its staff would devote full time to his services thereunder and would not engage directly or indirectly in any other business or profession. All work was to be performed in close cooperation with the Technical Cooperation Mission (the Indian arm of ICA) which was to be kept informed currently by Yulke of the nature of the work plans and progress thereon. It was further agreed that all projects would be carried out under the general policies established by the TCM. The Government of India provided, at no extra cost to Yulke or the Field Staff members, jeeps for their use, transportation while performing official services, office space and equipment, secretarial and interpretative services and official communications in India. Because of the nature of the work involved, the salaries of the Field Staff were not held to be subject to Indian income taxes. The contract specifically stated that it would *211 remain in force until June 30, 1961, unless terminated earlier at the initiation of ICA. Petitioner was contacted in the late summer of 1959 by the Yulke corporation. Following a series of conferences and psychological tests, petitioner joined the corporate staff as an engineer, to work on foreign assignments out of the company office in Copenhagen, Denmark. On December 4, 1959, petitioner flew to Washington, D.C., for interviews with the ICA. They approved him and on the same day petitioner signed an employment contract with Yulke which provided in part: The following sets forth the general provisions existing between the S. G. YULKE COMPANY, INC., and the undersigned as they relate to the operation and establishment of a pilot production and development center in Rajkot, India, for a proposed approximate twoyear period under an agreement between the I.C.A. and the S. G. YULKE COMPANY, INC. 1. We hereby agree to employ you as a Mechanical Engineer, Project Supervisor to perform such general duties as: (a) Planning, scheduling and factory layout (b) Instruct and advise on techniques of manufacture and equipment needed for a factory as a whole (c) Organize, direct and *212 coordinate the work of technical personnel and the conduct of a factory-wide training program (d) Such other duties as may be necessary in connection with the operation and establishment of a pilot production and development center in Rajkot. Your employment will commence when you leave your home in travel status to the center in Rajkot, India, and said employment shall continue for an appropriate period of two years, except as may be changed by I.C.A. through the exercise of its prerogatives of termination of contract, or of individual return for cause, or for approved reasons of health or security. Under this contract petitioner's living quarters in Rajkot, his salary, traveling methods, and allowances were all controlled by the basic project contract between Yulke and the ICA. Petitioner left the United States on December 6, 1959, by plane. He arrived in New Delhi, India, on December 8 and began a two weeks indoctrination program given there by TCM. After finishing the course, petitioner traveled to Rajkot arriving a few days before Christmas. For the next two months he lived in a house with other project technicians while his own home was being readied for occupancy. In *213 February 1960 petitioner's wife and 13 year old daughter joined him in Rajkot and they moved into a large rented bungalow owned by the Government of India in a residential area predominantly occupied by Indian nationals. The house was furnished partially by the owner and partially by petitioner with items brought over from the United States. Rent was paid by petitioner directly to the Indian Government and he was later partly reimbursed by Yulke pursuant to the employment and project contracts. Petitioner added a hot water tank to the bungalow and the piping which supported it. He also installed a private telephone for personal use and employed two servants to care for the home. Petitioner and his family ate locally grown food, purchased at markets in Rajkot. Foodstuffs not available at local markets were purchased through the commisary of the American Embassy in New Delhi. At the direction of petitioner his paychecks were split into three portions. Part was deposited in petitioner's checking account in his Pittsburgh bank to provide for his responsibilities in the United States. The second portion was sent directly to the commissary in New Delhi to pay for petitioner's food. The *214 remainder was sent to petitioner in Rajkot. Rajkot is an industrial town of approximately 250,000 people in western India. Its social life, by American standards, is very limited. Petitioner and his family entered into the life of the community. They opened a checking account in an Indian bank. Petitioner joined the Rajkot Chapter of Rotary International and during his stay there was the only non-Indian in the organization. He and his family joined and attended the Irish Presbyterian Church located in the city. Because the local schools did not provide an American curriculum, petitioner's daughter studied by correspondence. She lost time in school because of inaedquate educational facilities. She had a tutor who taught her to speak two of India's 14 languages. She participated in sports activities with Indian children. Petitioner and his family visited socially with Indian families and on occasions had Indians to their home for dinner. In the company of Indian families, petitioner and his family attended performances given by traveling entertainers. Petitioner attempted to learn the Indian language but but was unable to do so. However, his job was such that it was not necessary *215 for him to learn the language. Life in India was very hard for petitioner's wife and she was not satisfied with living conditions there. In August 1960 petitioner was informed that his progress on the project was unsatisfactory and that he would be replaced as team leader unless concrete gains could be shown within 30 days. By letter dated October 21, 1960, petitioner was informed by the Yulke Company that the program officials had requested his replacement and that his employment was terminated effective November 4, 1960. The letter also advised petitioner that he should make immediate arrangements for the return of his family and himself to New York and for packing and shipping his household possessions. The letter concluded by stating that S. G. Yulke expected to see petitioner soon in New York. For a short period thereafter, petitioner tried, though unsuccessfully, to find other employment as a management consultant in India. S. G. Yulke came to Rajkot in late November 1960 to talk with petitioner about his departure from India. After considerable discussion and exchange of views, a new contract was executed on December 12, 1960, between the Yulke Company and the petitioner *216 which provided that he and his family were to leave India for Copenhagen, Denmark, before the end of 1960. It further provided for possible employment of petitioner in Denmark upon his arrival there and included the following paragraphs: To the extent you do have contacts in Rajkot, you are to inform people that you are being reemployed by S. G. Yulke Company, Inc., as a regular member of its staff, beginning with an assignment in Denmark. This should indicate clearly to these individuals that we feel that your technical ability and your experience prior to the difficulties encountered by you at the Rajkot project, are sufficient for us to express our confidence in you by assigning you to a project elsewhere. * * *
We feel that this most generous offer on our part indicates our willingness to help ease the financial burden which has been placed on you by the cancellation of your services on our Rajkot industrial estate project as contained in the agreement between yourself and the S. G. Yulke Company, Inc., dated December 4, 1959. This should indicate to you that we are doing everything possible within our power to give you the opportunity of establishing your professional *217 ability as a management consultant with our staff. Your signature will constitute your acceptance of this agreement. The contract served to provide the petitioner with a satisfactory reason for telling other people why he was leaving the project and India. Petitioner and his family moved out of the rented bungalow on or about December 28, 1960, and moved into the Irish Presbyterian Mission House, but did not leave for Copenhagen until March 22, 1961. When petitioner left India, he shipped his household goods directly to New York City and did not send any of them to Denmark. There was no assignment waiting for petitioner in Denmark. Although he discussed the matter with S. G. Yulke and waited for a few days, no further assignment was given to him. Consequently, he and his family left for New York, arriving on April 25, 1961. Petitioner's initial passport was issued for 6 months but was later extended indefinitely at the discretion of the Indian Government. He registered only as a foreigner with the Government of India. Petitioner paid no income taxes or any other taxes to the Government of India while in that country. The S. G. Yulke Company made with-holdings from petitioner's *218 salary and paid such amounts to the Internal Revenue Service for the year 1960. In their 1960 income tax return, which shows their address as R.D. No. 1, Box 135-A, Sewickley, Pennsylvania, the petitioners reported as taxable income the amounts received as salary from the S. G. Yulke Company for the work performed in India in 1960. Ultimate Findings 1. Petitioner was not a bona fide resident of India for an uninterrupted period which included the entire taxable year 1960. 2. All amounts received by petitioner from S. G. Yulke Company in 1960 constituted taxable income. Opinion We must decide the narrow question whether, under these facts, the petitioner was a "bona fide resident" of Rajkot, India, during 1960 within the meaning of section 911(a)(1), [2] Internal Revenue Code of 1954. This determination is peculiarly one of fact, and must be decided in the light of its own particular circumstances. The decided cases are of very little aid and difficult to reconcile. See the cases cited in Donald H. Nelson, 30 T.C. 1151, 1153 (1958). Suffice it to say that there is no straight path through this vast labyrinth of decisions. *219 We view section 911(a)(1) as placing more than the usual burden of proof on the petitioner to establish compliance with the provisions of the statute. To be sure, Congress decided to add to the normal requirement that an exemption from income be strictly construed, the condition that a taxpayer claiming the exemption provided by section 911(a)(1) establish his status "to the satisfaction of the Secretary or his delegate [Commissioner]." We cannot ignore these words or treat them as meaningless. Petitioner must therefore demonstrate to our satisfaction that the Commissioner's determination was clearly wrong under these circumstances. Because of the positive and negative factors here present, we are not convinced that the Commissioner was wrong in refusing to be "satisfied" that petitioner was a bona fide resident of India during the entire year 1960. If the statutory language means anything, it is that the petitioner must offer strong proof in order to bring himself under the umbrella of 911(a)(1) and that this Court should resolve any doubt in favor of the Commissioner. See Frank Souza, 33 T.C. 817, 825 (1960); and cf. Roanoke Vending Exchange, Inc., 40 T.C. 735, 741 (1963). *220 Also important to our consideration of this case is the legislative history of section 911(a) and its predecessors. It was in 1942 that Congress changed its standard for permitting exemption by proving "nonresidency" in the United States to the more rigid requirement that the taxpayer prove himself to be a bona fide resident of a foreign country. [3] Then in 1951 Congress, stating that stringent application of the bona fide residence test had worked a hardship on many individuals working overseas, enacted an additional test which provided for exemption as a result of mere physical presence in a foreign country for a specified period of time. [4] In that time Congress chose not to revise, amend, or alleviate the strictness of the bona fide residence test. Thus the statutory history leads us to believe that Congress expected the courts to strictly interpret the exemption provision of section 911(a)(1), especially where a person is working in a foreign country on a specific project for a limited period of time. Cf. Ernest Rudolf Hertig, 19 T.C. 109 (1952). *221 Against this backdrop of the Congressional mandates of strong proof and strict compliance, the taxpayer's intent regarding the length of his stay in a foreign country is of crucial importance. To remove himself from classification as a "transient," a taxpayer's intent must be either indefinite or connected with the performance of a project requiring an "extended stay." [5] Petitioner was living in Rajkot for the purpose of working on a specific project for a limited time. His employment was actually terminated on November 4, 1960, less than a year after it began From that point on, the petitioner was certainly a mere "transient" or "sojourner." Having looked briefly for another job in India, petitioner began negotiating again with Yulke in late November for other work that would take him elsewhere. This led to the contract of December 12, 1960, which was little more than a face-saving device for petitioner. It was not intended to provide him with any definite assignment in Copenhagen and, in fact, he did not receive one when he arrived there, but left almost immediately for New York. These facts refute any intent the petitioner may have had to remain in India. Even if he had established *222 a bona fide residence in India by the beginning of 1960, his intent to remain there did not continue to exist throughout the entire year. Indeed, the contract of December 12, 1960, specified that he was to leave India before the end of the year. For at least the last 19 days of the year petitioner was under contract not to remain in India. By this act he abandoned any residence he might have had. The mere fact that he and his family remained temporarily in the Irish Presbyterian Mission House until March 22, 1961, does not show the intent necessary to meet the "bona fide resident" requirement of section 911(a)(1) since physical presence alone is not enough. After carefully considering all the facts and circumstances established by this record and the authorities relied on by the parties, we conclude that the petitioner was not a bona fide resident of Rajkot, India, for the entire taxable year 1960. Therefore, Decision will be entered for the respondent. Footnotes
1. Respondent concedes in his brief that the amounts here involved were not "paid by the United States or any agency thereof," as provided by section 911(a)(1). See Eldon E. Wolfe, 43 T.C. 572↩ (1965).
2. SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES. (a) General Rule. - The following items shall not be included in gross income and shall be exempt from taxation under this subtitle: (1) Bona Fide Resident of Foreign Country. - In the case of an individual citizen of the United States, who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income (as defined in subsection (b)) attributable to such period; but such individual shall not be allowed as a deduction from his gross income any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this paragraph.↩
3. See S. Rept. No. 1631, 77th Cong., pp. 54, 116 and Conference Report, H. Rept. No. 2586, 77th Cong., p. 44 (1942). ↩
4. See S. Rept. No. 781, 82d Cong., p. 53 (1951), pertaining to the predecessor provision of what is now section 911(a)(2)↩.
5. Section 1.871-2(b), Income Tax Regs.↩