ELDON E. WOLFE AND SARA A. WOLFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1651–63.   Filed January 29, 1965.

*E. E. Wolfe, Jr.*, for the petitioners.
*Eugene I. Meyers*, for the respondent.

Respondent determined deficiencies in petitioners' income tax for the years 1959 and 1960 in the respective amounts of $2,399.97 and $1,579.95. In his statutory notice of deficiency respondent determined that the petitioners had excluded from their gross income during the years in question amounts which were properly subject to tax because they did not represent exempt income under section 911 of the Internal

Revenue Code of 1954. In the petition it is alleged that the source of petitioners' income for the years before us was from a fund owned by the Imperial Government of Iran, and that petitioner was not paid by the United States or an agency thereof.

The sole question for our decision is whether during the taxable years in question petitioners' income was "paid by the United States or any agency thereof" within the meaning of that phrase in section 911 of the 1954 Code.

### FINDINGS OF FACT

Nearly all of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein and made a part of our findings by reference.

The petitioners, husband and wife, are both U.S. citizens and currently reside in Washington, D.C. They filed their joint Federal income tax returns for the years 1959 and 1960 with the Director of International Operations, Washington, D.C. For the year 1959 they excluded the amount of $14,578 from their gross income under section 911 of the 1954 Code. Of that amount, $1,609 was earned by Sara A. Wolfe as an employee of the Iran-America Society. There is no dispute as to this amount. For the year 1960 petitioners excluded $7,302.51 from their gross income on the same grounds.

Eldon E. Wolfe, during the years at issue, was employed as a highway bridge engineer by the Bureau of Public Roads which is part of the U.S. Department of Commerce. The Bureau of Public Roads (sometimes hereinafter referred to as Bureau) is an "agency" of the United States as that word is used in the parenthetical phrase "except amounts paid by the United States or any agency thereof" in section 911 of the Internal Revenue Code of 1954.

On December 7, 1956, the Imperial Government of Iran entered into a credit agreement with the Export-Import Bank of Washington (hereinafter referred to as Eximbank) in connection with a road construction project in Iran. The project involved the Bureau of Public Roads in an undertaking which was entered into by such agency with Iran pursuant to and in accordance with the applicable provisions of the Mutual Security Act of 1954.

Pursuant to the provisions of article III of the credit agreement of of December 7, 1956, Iran designated the Riggs National Bank of Washington, D.C., as the depositary for funds constituting the revolving fund which was to be "used by Iran exclusively for the purpose of financing United States dollar expenditures in connection with the Project."

In accordance with the provisions of articles III and IV of the credit agreement, Eximbank advanced to the Iranian Government the total sum of $947,597.96 over the years 1957, 1958, and 1959.

The loan agreement contained a number of restrictions, including a maximum line of credit of $5 million; the requirement that Iran submit detailed financial statements before each succeeding $500,000 advance; and a negative pledge that no other external debt of the Iranian Government would have priority over this loan. According to the terms of articles X and XI any default in the prompt and full payment of any installment of principal or interest on any advance under the loan was to make the entire principal and interest become payable at the option and demand of the holder. As of January 1, 1964, Iran had repaid the entire amount of this loan, plus the interest, to Eximbank.

The credit agreement also prescribed in article XVII that prior to and as a condition of the first advance under the loan the U.S. Bureau of Public Roads would make arrangements satisfactory to the Eximbank under which the Bureau would provide the services of U.S. engineers and technicians to carry out the project. It was this aspect of the agreement that brought the petitioner, Eldon E. Wolfe, to work in Iran.

Prior to April 7, 1956, the petitioner was employed in the competitive civil service of the U.S. Government. On April 7, 1956, he terminated his competitive service status, and received an appointment in the excepted service of the U.S. Government on the following day. He was then assigned to perform services in Pakistan as an employee of the Bureau of Public Roads. On June 22, 1957, the petitioner was transferred from Pakistan to the Iran Division in Tehran.

Neither the Iranian Government nor any of its employees was empowered to, or did, supervise or control the work of any of the employees of the Iran Division. The Iranian Government could not hire or fire any of the employees of the Iran Division or in any manner control the salary paid or the promotions given to any of the personnel of the Bureau of Public Roads assigned to the Division.

The petitioner and his wife left Iran on April 5, 1960, for the United States, and reported to Washington, D.C., for duty on May 24, 1960. Effective July 10, 1960, he was officially transferred from the Iran Division to the Office of Engineering, Bridge Division, Bureau of Public Roads, U.S. Department of Commerce, Washington, D.C.

The transfer of the petitioner from Pakistan to Iran in 1957 was an action taken by the Bureau of Public Roads at its initiative and that of the petitioner, but not that of any foreign government.

Pursuant to the requirement in article XVII of the credit agreement that some arrangement be entered into between the Bureau of Public Roads and the Imperial Government of Iran for the loan of Bureau employees, a letter agreement was signed between the two Governments on December 18, 1956. This letter agreement specified that the Bureau would assign a certain number of personnel for a period not to exceed 2 years unless the credit agreement was extended.

The fundamental mechanics of payment of the assigned employees are described in the agreement as follows:

### V. COMPENSATION OF PERSONNEL ASSIGNED TO IRAN

The compensation of all personnel of the Bureau assigned to Iran from the date of assignment to the date of separation from the program will be paid or reimbursed out of the Dollar Working Fund to be established by your Government [Iran] as provided in Paragraph VII.

The compensation of each employee will include his salary, post differential, post allowance, quarters allowance, education allowance, and separation allowance, all as prescribed for an employee of the Bureau of his grade and term of service by the applicable United States statutes and regulations as now in effect or hereafter amended. Salaries and wages will be paid on the basis of a 40-hour week in accordance with the existing United States regulations.

\*     \*     \*     \*     \*     \*     \*

### VII. DOLLAR WORKING FUND

To carry out the conditions of the $5,000,000 loan from the Export-Import Bank signed on December 7, 1956 your Ministry [Iran] will establish a Dollar Working Fund in the maximum amount of $500,000 with the Bureau to be at the disposal of the Bureau for the payments as set out in this Agreement.

The Dollar Working Fund shall be established in the amount of $200,000 and shall be replenished by your Government [Iran] from time to time upon the request of the Bureau accompanied by an itemized statement signed by an authorized representative of the Bureau setting forth all expenditures made therefrom which have not been reported in any previous itemized statement. With respect to each such expenditures, such statement shall specify the date, purpose and amount thereof and the name and address of the person or other entity receiving the same and shall be accompanied by such supporting documents as your Government [Iran] may reasonably request.

For such replenishment of the Dollar Working Fund by your Government shall be in an amount equal to the total of the expenditures set out in the itemized statement accompanying the request for replenishment. In connection with any such replenishment of the Dollar Working Fund, your Government shall deposit therein such additional amount as the Bureau may recommend and your Ministry may approve to meet prospective expenditures from the Dollar Working Fund; provided, however, that the amount in the Dollar Working Fund at any one time shall not exceed $500,000.

Pursuant to the terms of paragraph VII of the letter agreement of December 18, 1956, a dollar working fund was established by Iran in favor of the Bureau of Public Roads. Checks drawn on the Riggs

National Bank by Iran and made payable to the Bureau of Public Roads were deposited with the U.S. Treasury Department and credited to a trust fund account entitled "Technical Assistance, United States Dollars Advanced From Foreign Governments, Bureau of Public Roads." Salaries paid to Bureau of Public Roads personnel, including the petitioner, who were assigned to the Iran Division throughout 1959 and through July 10, 1960, were either reimbursed from or were directly charged against the Treasury account previously mentioned. This trust fund was not physically segregated in any way. Thus petitioner was paid by a check drawn by the Treasurer of the United States on proceeds of this dollar working fund.

The funds credited to this Treasury account were not appropriated by Congress for salary expenses for Bureau of Public Roads personnel, but were funds provided by the Imperial Government of Iran to which the Bureau was required to account for expenditures on the project.

In article XI of the credit agreement the Iranian Government agreed to indemnify all Bureau personnel from any civil claims arising out of their employment unless such claims were based upon gross negligence or willful misconduct.

The petitioner did not pay or owe any income taxes to any foreign government based on the salary he received in each of the years 1959 and 1960 from the Bureau of Public Roads.

During the years in question the Bureau of Public Roads deducted from petitioner's salary the regular 6½-percent Federal employee retirement contribution, and an amount representing his contribution for the U.S. Government employee group life insurance. Moreover, the petitioner was entitled to exercise rights under the U.S. Government employee group health benefits program.

The petitioner is a career civil service U.S. Government employee, having commenced his service counting toward career tenure on July 12, 1937. The entire period he spent assigned to the Iran Division counted as service toward his career tenure. During his service in Iran petitioner received periodic grade and ingrade step increases, as well as a foreign differential allowance equal to 10 percent of his applicable base salary rate.

#### OPINION

KERN, *Judge:* The question in this proceeding is whether the salary received by the petitioner for services which he performed in Iran constitute "amounts paid by the United States or any agency thereof"

within the terms of section 911 of the Internal Revenue Code of 1954.[1]

If we answer this question in the affirmative, the petitioner would not be entitled to exclude the wages in question under section 911, and respondent's determination would be sustained.

It is the position of the respondent that the petitioner was paid by the United States and cannot exclude the salary payments derived from his work in Iran because the United States had the primary obligation to pay his compensation. Respondent contends that the proper test in interpreting the statute should be that of "primary legal obligation" or "debt satisfaction." Respondent further urges that the legislative history of section 911(a)(2) of the 1954 Code indicates that the purpose of the phrased exception to the exclusion was to eliminate possibilities of double taxation. Because no double taxation exists in the case at bar, respondent insists that the exclusion should not apply.

In reply, petitioner argues that the "primary legal obligation" test is incorrect and is not supported by authority. He suggests that the

---

[1] SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.

(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—In the case of an individual citizen of the United States, who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income (as defined in subsection (b)) attributable to such period; but such individual shall not be allowed as a deduction from his gross income any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this paragraph.

(2) PRESENCE IN FOREIGN COUNTRY FOR 17 MONTHS.—In the case of an individual citizen of the United States, who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or an agency thereof) if such amounts constitute earned income (as defined in subsection (b)) attributable to such period; but such individual shall not be allowed as a deduction from his gross income any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this paragraph. If the 18-month period includes the entire taxable year, the amount excluded under this paragraph for such taxable year shall not exceed $20,000. If the 18-month period does not include the entire taxable year, the amount excluded under this paragraph for such taxable year shall not exceed an amount which bears the same ratio to $20,000 as the number of days in the part of the taxable year within the 18-month period bears to the total number of days in such year.

(b) DEFINITION OF EARNED INCOME.—For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.

correct construction of the statute involves an inquiry into who bears the economic burden of the salary payment, or asking who has the real ownership of the funds from which the payment is made. He insists that under the facts the United States acted in a mere paymaster capacity. Moreover, he contends that despite any legislative history to the contrary, the respondent's contentions would do violence to the plain language of the statute. In support of this point petitioner cites *Krichbaum* v. *United States*, 138 F. Supp. 515.

We are unable to agree with respondent's contention that the "primary legal obligation" test will lead to a correct solution of our problem. Whether petitioner was an employee of the United States or of the Empire of Iran is immaterial. See *Leif J. Sverdrup*, 14 T.C. 859, 866; *Robert W. Teskey*, 30 T.C. 456, 461; *Lawrence P. Dowd*, 37 T.C. 399, 406; and *Erlandson* v. *Commissioner*, 277 F. 2d 70, 72, affirming a Memorandum Opinion of this Court. The question for our decision is whether the amounts of petitioner's income here in issue were "amounts paid by the United States or any agency thereof." If they were paid by the United States they would be includable in petitioner's gross income according to the views expressed in the cited cases, even though petitioner was not an employee of the United States. Conversely it would follow that if they were not paid by the United States or an agency thereof they would not be includable in petitioner's gross income even though petitioner was an employee of the United States.

The precise question here is whether the checks issued to petitioner by the Treasurer of the United States for the amounts in issue and paid from funds which were owned by the Iranian Government and which had been deposited by that Government with the Bureau of Public Roads for that purpose were issued by the United States in the role of a payor or in the role of a paymaster for the Iranian Government.

The facts in the instant case are quite similar to those in *Krichbaum* v. *United States, supra.* There, as here, the taxpayer was an employee of the Bureau of Public Roads of the U.S. Department of Commerce, was "loaned" by his regular employer to a foreign government (Ethiopia) for work therein, and was paid by checks drawn by the United States which were paid from funds borrowed by the Ethiopian Government from the International Bank and deposited by it with the United States for the purpose of paying the salaries of the taxpayer and others who had been "loaned" by the American Government. In that case it was held that the amounts so paid to the taxpayer were not "amounts paid by the United States or any agency thereof" and, accordingly, were not includable in the taxpayer's gross income.

Respondent contends that the *Krichbaum* case is distinguishable from the instant case since in that case the Ethiopian Government expressly assumed the obligation to pay the salaries of the personnel

"loaned" to it by the Bureau and therefore the salary of the taxpayer in that case was a debt of Ethiopia which was paid with Ethiopia's money, while in the instant case there was no express assumption by the Iranian Government of the obligation to pay petitioner's salary while he was on loan to Iran.

While the assumption by the Iranian Government of an obligation to pay the salaries of the personnel "loaned" to it by the Bureau of Public Roads was not as specific and categorical as the assumption of such liability by the Ethiopian Government in the *Krichbaum* case, we are of the opinion that the letter agreement of December 18, 1956, entered into between the Bureau and the Government of Iran, from which we have quoted in our findings, clearly indicated that the Iranian Government undertook the obligation of paying petitioner's salary out of its own funds. It provided that "The compensation of all personnel of the Bureau assigned to Iran * * * will be paid or reimbursed out of the Dollar Working Fund to be established by * * * [the Iranian] Government" and that "The Dollar Working Fund shall be established in the amount of $200,000 and shall be replenished by * * * [Iran] from time to time upon the request of the Bureau," from which the Bureau was to make "the payments as set out in this Agreement," which included the compensation of personnel assigned to Iran. Simply stated, the Government of Iran, wishing to have road construction work done in Iran with the aid of trained personnel of the Bureau of Public Roads and as an inducement to the Bureau to furnish such personnel, not only agreed that the salaries of such personnel would be paid from funds belonging to Iran but also, in effect, guaranteed the payment of such salaries by depositing its funds with the Bureau so that the Bureau could cause the issuance of checks against these funds for that purpose.

In our opinion the question of whether the obligation of the Iranian Government ran directly to petitioner and the question whether the obligation of Iran in connection with the payment of petitioner's salary was primary or secondary are irrelevant. See *Erlandson* v. *Commissioner, supra* at 73. The point is that pursuant to an obligation of some kind imposed on it by the letter agreement of December 18, 1956, the Iranian Government authorized the payment from its funds of petitioner's salary earned by the performance of services to Iran at its request and for its benefit. It is our opinion that in drawing the checks upon the funds belonging to Iran for the payment of petitioner's salary, under the circumstances of this case, the officials of the United States were acting as paymasters for Iran and that the amounts of such salary were not "amounts paid by the United States or any agency thereof."

*Decision will be entered for the petitioners.*