**COMMISSIONER OF INTERNAL REV-ENUE, Petitioner,**

**v.**

**Eldon E. WOLFE and Sara A. Wolfe, Respondents.**

**No. 19617.**

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 10, 1966.

Decided April 22, 1966.

Fahy, Circuit Judge, dissented.

Mr. Harold. C. Wilkenfeld, Atty., Dept. of Justice, for petitioner. Messrs. Rich-ard M. Roberts, Lee A. Jackson and David L. Granger, Attys., Dept. of Justice, were on the brief for petitioner.

Mr. E. E. Wolfe, Jr., Columbia, S. C., for respondents.

Before BAZELON, Chief Judge, and FAHY and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

Respondents are husband and wife who filed a joint tax return in 1959 and 1960, the tax years subject to the dispute in this case. They sought exclusion, under § 911(a) (2) of the Internal Revenue Code of 1954, of amounts earned by them while residing and working in Iran during the years in question. The Commissioner allowed the exclusion of the wife's income in Iran. The sole question is whether respondent Eldon E. Wolfe properly excluded, as exempt from federal income taxation, amounts earned while employed by the United States Bureau of Public Roads to work on a highway project of the Government of Iran.

Section 911(a) (2) exempts from taxation earned income received by a United States citizen located in a foreign country for eighteen consecutive months if such income constitutes "amounts received from sources without the United States (except amounts paid by the United States or an agency thereof)." Mr. Wolfe satisfies the foreign residency requirements of § 911. The question is whether the amounts received by him from his employer, the United States Bureau of Public Roads, are to be considered "amounts paid by the United States or an agency thereof," and thus outside the scope of the exemption.

On December 7, 1956, the Government of Iran entered into a credit agreement with the Export-Import Bank (Eximbank) in Washington with respect to a road construction project in Iran. Pursuant to this agreement Iran deposited in the Riggs National Bank in Washington funds, out of the proceeds of the Eximbank loan, to be used "exclusively for the purpose of financing United States dollar

expenditures in connection with the Project." The credit agreement also provided that prior to and as a condition of the first advance under the loan to Iran, the Bureau of Public Roads would make arrangements satisfactory to Eximbank for providing the services of United States engineers and technicians for the road construction project. It was this aspect of the agreement that brought the taxpayer to work in Iran.

The Tax Court concluded that taxpayer was entitled under § 911(a) (2) to exclude from his income the salary paid him by the Bureau of Roads for his work in Iran. 43 T.C. 572 (1965). It reasoned that since the reimbursement provisions of the credit agreement between the Eximbank and Iran placed the ultimate burden of taxpayer's salary on the Government of Iran, Wolfe's salary did not represent "amounts paid by the United States or an agency thereof." In drawing the checks upon the funds belonging to Iran for the payment of petitioner's salary, concluded the Tax Court, "the officials of the United States were acting as paymasters for Iran." 43 T.C. at 579.

We cannot agree with the Tax Court's interpretation of the statute and its application of the statute to the facts of this case. We disagree, too, with a similar ruling in Krichbaum v. United States, 138 F.Supp. 515 (E.D.Tenn. 1956).

■ A. In our opinion the exception provision has broad sweep as to taxpayers who are employees of the U. S. Government, as well as applying in some circumstances [1] to taxpayers who are not employees. The salient features of this case are certainly sufficient, though we do not say they are all necessary, to establish that taxpayer's salary should be

viewed as "amounts paid by the United States or an agency thereof." Four aspects are especially significant.

1. Taxpayer was an employee of the United States, maintaining unique status as such and receiving unique benefits as such.

On April 8, 1956, taxpayer, an employee of the Bureau of Public Roads, transferred from the competitive civil service and accepted an appointment offered by the Bureau in the excepted service. He was then assigned to perform services in Pakistan. On June 22, 1957, he was transferred from Pakistan to the Iran Division in Tehran. Neither the Iranian Government nor any of its employees was empowered to, or did, supervise or control the work of any of the employees of the Iran Division. The Iranian Government could not hire or fire any of the employees of the Iran Division or in any manner control the salary paid or the promotions given to any of the personnel of the Bureau of Public Roads assigned to the Division.

As a United States Government employee in the excepted service having prior Civil Service status, Wolfe was covered throughout the period by various federal laws giving benefits to Government employees.[2] The Tax Court found (43 T.C. at 576):

During the years in question the Bureau of Public Roads deducted from petitioner's salary the regular 6½ percent Federal employee retirement contribution, and an amount representing his contribution for the U. S. Government employee group life insurance. Moreover, the petitioner was entitled to exercise rights under the U. S. Government employee group health benefits program.

1. Erlandson v. Commissioner, 277 F.2d 70 (9th Cir. 1960); Laurence P. Dowd, 37 T.C. 399 (1961); Robert W. Teskey, 30 T.C. 456 (1958).

2. These laws are as follows: (1) Performance Rating Act; (2) Government Employees' Incentive Awards Act; (3) Federal Employees' Pay Act; (4) Annual and Sick Leave Act; (5) Federal Employees' Compensation Act; (6) Civil Service Retirement Act; (7) Unemployment Compensation Act; (8) Federal Employees' Group Life Insurance Act; (9) Federal Employees' Health Benefits Act.

The petitioner is a career civil service U. S. Government employee, having commenced his service counting toward career tenure on July 12, 1937. The entire period he spent assigned to the Iran Division counted as service toward his career tenure. During his service in Iran petitioner received periodic grade and in-grade step increases, as well as a foreign differential allowance equal to 10 percent of his applicable base salary rate.

Furthermore, taxpayer had re-employment rights to reinstatement in the competitive service; and he was reinstated in the competitive service effective July 10, 1960.

2. The United States had the primary and indeed sole obligation to pay taxpayer's salary, and his rights were only against the United States.

Taxpayer's only contract, whether express or implied through employee status, was with the United States. The parties stipulated:

> Eldon E. Wolfe at no time, and in no event, had any right to request or demand payment of his salary from Iran. Mr. Wolfe did not acquire, by virtue of either his employment agreement with the Bureau of Public Roads or his assignment to the Iran Division, any direct rights against the Iranian Government [except immunity from taxation by Iran].

Taxpayer's only connection with Iran was as an engineer included in a group of employees of the Bureau of Public Roads sent by the Bureau to Iran to assist Iran in developing a highway system. His presence in Iran was in discharge of the obligation of the Bureau, under a letter agreement with Iran, to send experts to assist Iran.

Iran agreed to make funds available to the Bureau in order that the Bureau might pay taxpayer's salary. But the obligation of Iran ran to the United States, not to taxpayer.

It was stipulated that taxpayer had no agreement either with Iran or with the Bureau of Public Roads whereby payment of his salary was to be made out of Iranian funds or was dependent upon advances having first been made by Iran to the Bureau.

3. A United States agency actually executed and delivered the salary checks to taxpayer.

The Tax Court specifically found that taxpayer's salary was paid by a check drawn by the Treasurer of the United States. The record shows that the Treasury checks were drawn on the appropriation of the Bureau of Public Roads.

This payment was reimbursable to the Bureau by Iran through payments by check, payable to the Bureau of Public Roads, which were deposited with the United States Treasury Department and credited to a trust fund account entitled "Technical Assistance, United States Dollars Advanced From Foreign Governments, Bureau of Public Roads." Salaries paid to Bureau of Public Roads personnel, including the taxpayer, who were assigned to the Iran Division throughout 1959 and through July 10, 1960, were either reimbursed from or were directly charged against the Treasury account previously mentioned. This trust fund was not physically segregated in any way.

4. In addition to these three primary factors, there are also in this record secondary facts supporting the Government's position. To take an analogy from the game of bridge, these are not "quick tricks" but rather "plus" values filling in the hand. We note the following:

a. Taxpayer was exempt not only from all income taxes, but also from duties, fees and customs charges of Iran and any political subdivision thereof, by virtue of the agreement between Iran and the Bureau of Public Roads.

b. Taxpayer's income under review includes a 10% increment over his base salary as a foreign post differential.

c. Although the basic salary paid to taxpayer was reimbursed to the Bureau by Iran, there were financial burdens on

the U. S. Government which were not compensable by Iran. The agreement provides for reimbursement of salary and certain allowances, but these do not include the "employer" contributions of the Government toward retirement benefits and group life insurance.

d. The Iranian use of personnel provided by the Bureau of Public Roads was a requirement of the U. S. Government (Eximbank) as a condition of the loan to Iran. And, of course, the dollars used by Iran were an advance from the United States Government, which bore the credit risk that the dollar loan might not be repaid.

B. The only fact brought out to support the claim of exemption is the fact that Iran, by agreement, had the obligation to reimburse the United States for its salary payments to taxpayer as its employee. As already noted in item c, this left some economic burden on the United States. But even assuming Iran reimbursed the United States fully, taxpayer's relations were solely with the United States, not at all with Iran.

Ready analogies abound in private economic relations. Frequently an American company agrees to furnish a foreign company with American know-how and to station abroad an American employee equipped to transmit that know-how. The foreign company typically agrees, in addition to a fee, to reimburse the American company for the salaries paid to its American employees while assigned to the foreign company's premises. It is plain that the American employee assigned to duty on the licensee's premises is receiving amounts paid by his continuing American employer, even though that American company is being reimbursed for his salary, a cost which it incurs in the first instance and for which it is liable to him.

The tax law is concerned with the arrangements of the taxpayer. It is strained to read the law as making his liability to tax depend on arrangements between his employer and some one else which are beyond his sphere of concern.[3]

C. Our interpretation is consonant with and in furtherance of the Congressional objectives underlying the exception to § 911. The legislative history is set forth in Krichbaum v. United States, *supra,* and need not be reviewed at length here.

The original statute exempting from United States taxation the income earned by American citizens abroad was intended to help our foreign trade and to put Americans who work abroad in a position of equality with their competitors by leaving them subject only to the income tax levied on them by the country where they were employed. See 138 F.Supp. at 519.

The exception for amounts paid by the United States or any agency thereof was written into the law in 1932 in what was then § 116 of the Internal Revenue Code. The Senate Finance Committee, which first sought complete elimination of the exclusion of foreign income, made particular reference to the unsuitability of granting the exemption to United States employees, S.REP. No. 665, 72d Cong., 1st Sess. p. 31:

> Furthermore, a considerable proportion of the individuals previously benefited by this sub-section have been employees of the United States who, because of their status as such, were usually exempt from any foreign tax upon their compensation received from the United States; these citizens are not believed by your committee to be entitled to a complete exemption from the Federal income tax upon such compensation.

On the floor, Senator Reed disagreed with the Committee on abolishing the exemption entirely, and proposed the exception

---

3. The record shows that when taxpayers were requested by the Internal Revenue Service to provide a copy of the Eximbank credit agreement and other disbursement information, taxpayers had to obtain this from Eximbank, which advised that it was providing this information to taxpayer's attorney as a matter of courtesy to him and Senator Johnston and on the understanding that it would be used only to assist in preparation of the facts in the tax controversy.

for United States employees. His views ultimately won out. Senator Reed stated that the purpose of the exemption generally was to avoid double taxation of Americans working abroad, and to put them "in a position of equality with their competitors," but that this was wholly inapplicable to Government employees. (See 75 CONG.REC. 10410):

> We discovered that the provision had been stretched to the point of exempting an American naval officer or army officer who was stationed, let us say, in the embassy in London or in some foreign country, like our troops in China. Those people were getting complete exemption from the American income tax. We discovered further, to our surprise, that it had been held that American ambassadors and ministers and officers of the Foreign Service were getting clear out of the payment of any income tax by virtue of the same provision, which nobody in the world ever intended when the provision was first adopted. These people do not deserve the exemption, because they are not subject to the income taxation of the foreign countries in which they are stationed, any more than we would tax the British ambassador here in Washington on his income.

Taxpayer Wolfe's position clearly falls within the scope of the legislative purpose of the exception. He was a Government employee, and he was not subject to income tax by Iran. The agreement by Iran not to subject him to income tax confirms what would be the normal practice with respect to an employee of a foreign government.

We think the wording of the statute, the ordinary meaning of the words used, and the legislative history, all support the view that basically salaries of U. S. Government employees paid by the U. S. Government are not within the exemption. We see no basis for inserting a gloss that would make the tax exemption applicable where the Government receives reimbursement (here, not complete reimbursement) from another source having no direct relationship to employee-taxpayer. No difference in legislative intention should be ascribed to the fact that the reimbursement is secured by an advance deposit (here made with funds in turn advanced by the U. S. Government).

It has not been suggested to us why the tax policy or any other policy of the Government would be furthered by giving the employee whose salary cost is thus reimbursed, say, an extra 15 percent, or more, depending on his tax bracket, according him a net benefit not conferred, e. g., on an Army officer serving as an aide to the Army of South Vietnam, and relieving him of the obligation resting on all other Government employees to pay federal income tax on their Government salary.

No such distinction based on reimbursement to the Government has been noted in any committee report or similar legislative history. If interjected into the tax law it would create invidious discriminations among the U. S. Government employees assigned for service abroad, dependent on adventitious factors having nothing to do with their employment relationship with the Government or rights to compensation from the Government.

Reversed.

FAHY, Circuit Judge (dissenting):

I would affirm the Tax Court, whose decision accords with Krichbaum v. United States, 138 F.Supp. 515 (E.D. Tenn.).

Admittedly, all along, taxpayer was an employee of the United States, in an excepted position,[1] and admittedly he could

---

I. The majority relies in good part on government employee benefit programs in which the appellee was allowed to participate by contributing. The government also made small contributions to two of these programs. These contributions grew out of the employer-employee relationship, leaving unanswered in the circumstances of this case the question whether the United States or Iran paid the amounts of salary involved.

68

look only to the United States for payment of his salary. But the provision of the tax statute now construed looks to the "source" of the income to be exempted, not to the employer-employee relationship. The provision must be construed in conjunction with the Export-Import Bank Act of 1945[2] and the Mutual Security Act of 1954.[3] Under those Acts certain financial arrangements were made between the United States and Iran, as a result of which Iran and not the United States bore the burden of taxpayer's salary while he was on loan to Iran. Except in the formal sense that his salary was remitted to him by check of the United States it was paid by Iran. The payment, though at times referred to as reimbursement, was from a deposit of funds Iran made with the United States as now explained.

Iran had entered into a loan agreement with the Export-Import Bank of Washington. A maximum line of credit of $5,000,000 was established with the Bank. The agreement provided for loan to Iran of employees of the Bureau of Public Roads. It was pursuant to this that respondent husband, an employee of the Bureau, was loaned to Iran. The agreement further provided that compensation of such personnel would be paid or reimbursed out of the "Dollar Working Fund" established under the agreement and actually on deposit with the United States Treasury Department as a trust fund entitled "Technical Assistance, United States Dollars Advanced from Foreign Government, Bureau of Public Roads." Initially $200,000 was placed in the Dollar Working Fund. The agreement provided that the Fund should be replenished by Iran from time to time at the request of the Bureau, and the parties have stipulated that such funds "have been advanced by foreign governments, as a general rule, prior to the actual expenditure of moneys by the United States." It would appear the requisite

deposit by Iran preceded the payment of Wolfe's salary; but even if there were a temporary time lapse this would have no significance. For taxpayer's salary here involved came out of a fund established by Iran in the manner described. It was not paid out of any money belonging to the United States. As the Tax Court found,

Salaries paid to Bureau of Public Roads personnel, including taxpayer, who was assigned to the Iran Division throughout 1959 and through July 10, 1960, were either reimbursed from or were directly charged against the Treasury account "Dollar Working Fund" previously mentioned. This trust fund was not physically segregated in any way. Thus taxpayer was paid by a check drawn by the Treasurer of the United States on proceeds of this Dollar Working Fund. The funds credited to this Treasury account were not appropriated by Congress for salary expenses for Bureau of Public Roads personnel, but were funds provided by the Imperial Government of Iran.

Consideration of the objectives of the provisions under which American personnel are obtained by foreign governments supports the view that the salary was tax exempt as paid by Iran. The statutes under which the monetary loan to Iran was made and personnel obtained, set forth the objectives to be in part "to aid in financing and to facilitate exports and imports and the exchange of commodities between the United States * * and any foreign country or the agencies or nationals thereof. * * * "[4] Under the agreement with Iran, in addition to loan of men, the funds borrowed were to be expended mainly in the United States in the purchase of equipment and the like. This is an immediate and measurable benefit to the economy of the United States. The loan of the men, however, was intended to have a long range effect on our economy by putting Iran in a

2. 12 U.S.C. §§ 635–635i (1964 ed.).

3. Mutual Security Act of 1954, ch. 937, § 505(b), 68 Stat. 851.

4. Export-Import Bank Act of 1945, 12 U.S.C. § 635(a) (1964 ed.). Also see Mutual Security Act of 1954, ch. 937, § 301, 68 Stat. 841.

better position to engage in foreign commerce through improved internal transportation. These benefits to the United States are achieved without reference to whether appellee's salary is taxed by the United States.

Moreover, legislative history shows that the general exemption was intended to encourage technical personnel to go abroad in furtherance of our political and economic objectives; that is, to encourage a bridge engineer like Mr. Wolfe to accept an assignment in Iran. When the exception "(except amounts paid by the United States or any agency thereof)" was added by the 72d Congress the legislators were focusing on those who were in the service of the United States and were abroad as a regular and ordinary incident of that service, namely, military and diplomatic personnel, not the volunteer who must be induced to go abroad. As Senator Reed said: "I was proposing to tax Americans who I think are unfairly exempted now, like officers of our military service and our Diplomatic Service * * *." 75 Cong.Rec. 10411 (1932). In adding what is now subsection (a) (2) of Section 911, which is our concern here, the Senate Committee specifically stated that this exemption was meant to encourage technical personnel to agree to work abroad for short periods of time in furtherance of our foreign aid policy: " * * * managers, technicians, and skilled workmen * * * are induced to go abroad for periods of 18 to 36 months to complete specific projects. Your committee believes, in accord with the point 4 program, that it is particularly desirable to encourage men with technical knowledge to go abroad." S.Rep. 781, 82d Cong., 1st Sess. 53 (1951); U. S. Code Congressional and Administrative Service 1951, p. 2024.

In a lengthy and well-balanced review of the history of the statute up to 1956 the District Court for the Eastern District of Tennessee, in the case of Krichbaum v. United States, *supra,* came to the conclusion reached by the Tax Court in the present case. The court there held that wages earned in Ethiopia by an employee of the Bureau loaned to that country, borne by money borrowed from the International Bank and transferred to the Government of the United States to cover the salary and other expenditures, were not to be included in gross income as "amounts paid by the United States or any agency thereof." The court said:

> If the United States is not the debtor but simply pays the amount which is in fact a debt of another debtor the amount so paid is within the exemption and without the exclusion in the exemption.

In the several instances in which Congress has amended the statute, three times since *Krichbaum,* no effort appears to have been made to clarify further the particular problem involved in *Krichbaum* and in our case. Since the problem has had the continuing attention of Congress through the years, it is fair to give some weight to Congressional silence in the face of three other amendments to Section 911 in the nine years since *Krichbaum.*

Absent further Congressional action it seems to me the Tax Court in our case, and the District Court in *Krichbaum,* reached the correct decision; that is, that since Iran actually paid the salary it should not be held to be an amount "paid by the United States or any agency thereof" within the intent and meaning of Section 911, though transmitted by a check of the United States. The amount was not taken from funds of the United States.