JOSEPH N. AND MARGARET J. SOBOLESKI, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10267-83.     Filed April 22, 1987.

*Edward N. Delaney, Evan M. Migdail,* and *John Hardin Young,* for the petitioners.
*Dennis D. Curtin,* for the respondent.

SWIFT, *Judge*: In a statutory notice of deficiency dated February 18, 1983, respondent determined deficiencies in petitioners' Federal income tax liabilities for 1980 and 1981 in the amounts of $9,089 and $3,463, respectively. The issue for decision is whether petitioners may exclude under section 911(a)[1] salary payments received by petitioner Joseph N. Soboleski for work he performed in Saudi Arabia as a civil engineer on the construction of a Saudi Arabian military installation.

### FINDINGS OF FACT

Many of the facts have been stipulated and are so found. Petitioners timely filed joint Federal income tax returns for 1980 and 1981, and an amended return for 1980. Petitioner Joseph N. Soboleski is a citizen of the U.S. and resided in Oman at the time the petition herein was filed. Petitioner Margaret J. Soboleski resided in Winchester, Virginia, at the time the petition herein was filed. Hereinafter, all references to petitioner will be to Joseph N. Soboleski.

For 25 years petitioner has been employed as a civil engineer with the U.S. Army Corps of Engineers (hereinafter referred to as the corps). The corps is an agency of the

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

U.S. Department of Defense. Since 1965, the corps has been engaged in the construction of military bases located within the Kingdom of Saudi Arabia pursuant to a bilateral agreement between the United States and Saudi Arabia generally referred to as the Engineering Assistance Agreement (EAA).[2]

During the periods from March 29, 1968, to June 14, 1969, and from October 10, 1976, to May 23, 1981, petitioner worked for the corps in Saudi Arabia as a supervising engineer on certain EAA construction projects. Under the EAA, the corps is authorized to provide Saudi Arabia with engineering and construction management services on a not-for-profit basis for the design and construction of certain Saudi Arabian military bases. As part of its management services, corps personnel in Saudi Arabia award contracts to construction companies to do work on the military bases. Corps personnel review costs of the companies associated with the construction contracts. They make payments on behalf of the corps to the construction companies, and they take other actions to monitor compliance with the contracts.

The work of individual corps personnel was not supervised or controlled by Saudi Arabian Government officials. As ultimate beneficiary of the work, however, the Saudi Arabian Government could influence the work of corps personnel. As an example, officials of the Saudi Arabian Government could request changes in the design of structures under construction, and they could request reductions in construction noise levels at certain times of the day. Also, they could restrict the use of corps automobiles to designated areas, and they could require corps personnel to respect Saudi Arabian religious customs and laws.

Prior to the commencement of a construction project, the corps furnished Saudi Arabia with an estimate of the total cost of a project. Upon approval by Saudi Arabia, the estimate was then submitted for approval to the U.S. Department of Defense (or the U.S. Congress if an estimate for a particular project exceeded $25 million). Upon ap-

[2]Agreement Relating to the Construction of Certain Military Facilities in Saudi Arabia, May 24 and June 5, 1965, 16 U.S.T. 890, T.I.A.S. 5830. During the years in issue, the EAA was authorized by secs. 21 and 22, Arms Export Control Act of 1968, Pub. L. 90-629, 82 Stat. 1323 (codified as amended at 22 U.S.C. secs. 2761 and 2762 (1982)).

proval by the Department of Defense (or the Congress), the corps notified the Saudi Arabia Ministry of Defense and Aviation (hereinafter referred to as MODA) that it was prepared to begin work on a project.

Each construction project undertaken by the corps pursuant to the EAA was entirely funded in advance by the Government of Saudi Arabia. Prior to the beginning of each fiscal year of the Saudi Arabian Government, the corps furnished MODA with an estimate of the costs expected to be incurred by the corps on all EAA projects in Saudi Arabia during the next fiscal year. The cost estimate included all salaries and employee benefits that would be paid to corps employees assigned to work in Saudi Arabia.

Upon approval by MODA of the yearly cost estimates, the Saudi Arabian Monetary Agency (hereinafter referred to as SAMA) funded the projects as follows. Upon approval of a project, SAMA would request Chase Manhattan Bank, N.A. (Chase Bank), in New York City to increase the amount of an irrevocable letter of credit it had issued on behalf of the Government of Saudi Arabia in favor of the corps in an amount sufficient to cover the total estimated costs of the EAA projects for the next fiscal year.

Upon notification of the increase in the amount of the letter of credit, and quarterly thereafter, the corps would present to Chase Bank a sight draft in an amount that was expected to cover the corps' costs for the next 90 days under the construction contracts with Saudi Arabia. Chase Bank would then transfer U.S. dollars in the amount of the sight draft to a United States Treasury account maintained in the name of SAMA at the Federal Reserve Bank in New York City. Funds deposited in this account were not recoverable by the Government of Saudi Arabia and were earmarked for payment to the corps with respect to its costs on the Saudi Arabian construction contracts.

At the first of each month and in amounts specified by the corps, funds were transferred out of SAMA's account at the Federal Reserve Bank in New York City to the Foreign Military Sales trust fund (hereinafter referred to as the FMS trust fund). The FMS trust fund was established by the U.S. Department of Treasury in order to facilitate sales of military-related goods and services by the United States

Government to foreign governments, including the sale of engineering and construction-related services to Saudi Arabia under the EAA. See 31 U.S.C. sec. 1321 (1982). The owner of the funds in the FMS trust account was the U.S. Government, and the corps had disbursement authority with respect to such funds. Funds from the FMS trust fund account were transferred on a regular basis to the corps' payroll center in Omaha, Nebraska, to enable the corps to pay the salary and benefits of corps employees working in Saudi Arabia.

Petitioner was interviewed and selected for work in Saudi Arabia by employees of the corps. The corps was solely responsible for determining which of its employees it would send to Saudi Arabia to work on the EAA construction projects. The Saudi Arabian Government, however, could deny entry visas to corps employees it finds unacceptable.[3]

During the years in issue, petitioner was assigned to work at Ras al Mish'ab, a Saudi Arabian naval base located on the Persian Gulf in northeastern Saudi Arabia. The corps previously had built a naval base at Ras al Mish'ab, and petitioner's assignment during 1980 and 1981 was to supervise certain modifications to the pier at the naval base and the construction of housing and other support buildings at the base. The construction project at Ras al Mish'ab was expected to cost $45 million.

Petitioner had general supervisory responsibilities over the construction project, such as interpreting contracts, making cost estimates, and approving modifications in the design of the naval base. Petitioner also supervised the four or five other corps employees assigned to Ras al Mish'ab, who included a contract administrator, a quality insurance inspector, and a secretary.

With respect to his work on the Ras al Mish'ab project, petitioner was supervised by a senior corps employee who was headquartered in Riyadh, Saudi Arabia, approximately 250 miles from Ras al Mish'ab. Petitioner's supervisor had general, supervisory responsibility over petitioner's work. He evaluated petitioner's job performance and recommended

---

[3]The Saudi Arabian Government apparently denied an entry visa to one corps employee during the years in issue. Upon request of the U.S. Department of State, however, the employee ultimately was granted an entry visa. Individual corps employees of varying religious and ethnic backgrounds have worked on EAA projects in Saudi Arabia.

petitioner for promotions, salary increases, and outstanding service awards. Petitioner's supervisor also was responsible for initiating administrative disciplinary action against petitioner, if any was necessary. Petitioner's employment with the corps could be terminated only by the corps, not by the Government of Saudi Arabia.

During the time petitioner worked for the corps in Saudi Arabia, he received yearly cost-of-living increases and periodic grade and in-grade step increases. Petitioner also received various employee benefits from the U.S. Government, including basic benefits granted to Federal employees (such as annual holiday and sick leave, workers' compensation, and health insurance). As an incentive to working abroad, petitioner received special benefits for Federal employees assigned to overseas posts (such as free transportation to and from Saudi Arabia and the United States, a foreign post differential allowance equal to 25 percent of base salary, and reemployment rights[4]). The corps' payroll center paid petitioner's salary on a monthly basis in U.S. dollars by means of U.S. Treasury checks. All of petitioner's salary and employee benefits was paid to petitioner by the corps with funds obtained by the corps from the FMS trust fund.

The corps had the sole obligation to pay petitioner for the work he performed in Saudi Arabia. Petitioner had no agreement with the Saudi Arabian Government or with any of its political subdivisions under which payment of his salary was to be dependent upon or to be made out of funds advanced by Saudi Arabia. Under the EAA, petitioner was not obligated to pay, and did not pay, any taxes or other duties, fees, or customs charges to the Government of Saudi Arabia with respect to his salary.

OPINION

### Foreign Earned Income Exclusion

Section 911[5] allowed certain U.S. citizens to exclude from gross income "amounts received from sources within a

---

[4]Reemployment rights guaranteed petitioner the opportunity to return to the same or comparable employment in the United States that he held immediately before he commenced work in Saudi Arabia.

[5]Sec. 911, as in effect in 1980 and 1981, provided in relevant part as follows:

foreign country or countries." An exception to the exclusion was provided, however, for "amounts paid by the United States or any agency thereof." Sec. 911(a); secs. 1.911-1(a) and 1.911-3(c)(3), Income Tax Regs. The issue in this case thus turns on whether the salary payments received by petitioner for work he performed in Saudi Arabia as an employee of the corps constitute amounts "paid by" an agency of the United States. If so, petitioner may not exclude such amounts from gross income under section 911(a). The parties agree that if we determine that petitioner was not paid by an agency of the United States, he has satisfied the other requirements of section 911[6] for

(a) GENERAL RULE.—In the case of an individual described in section 913(a) who, because of his employment, resides in a camp located in a hardship area, the following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—If such individual is described in section 913(a)(1), amounts received from sources within a foreign country or countries (except amounts paid by the United States or any agency thereof), which constitute earned income attributable to services performed during the period of bona fide residence. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

(2) PRESENCE IN FOREIGN COUNTRY FOR 17 MONTHS.—If such individual is described in section 913(a)(2), amounts received from sources within a foreign country or countries (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during the 18-month period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

An individual shall not be allowed as a deduction from his gross income any deduction or as a credit against the tax imposed by this chapter any credit for the amount of taxes paid or accrued to a foreign country or possession of the United States, to the extent that such deduction or credit is properly allocable to or chargeable against amounts excluded from gross income under this subsection, other than the deduction allowed by section 217 (relating to moving expenses).

(b) DEFINITION OF EARNED INCOME.—For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.

(c) SPECIAL RULES.—For purposes of computing the amount excludable under subsection (a), the following rules shall apply:

(1) LIMITATIONS ON AMOUNT OF EXCLUSION.—

(A) IN GENERAL.—The amount excluded from the gross income of an individual under subsection (a) for any taxable year shall not exceed an amount which shall be computed on a daily basis at an annual rate of $20,000 for days during which he resides in a camp.

[6]The parties agree that petitioner was a bona fide resident of a foreign country and that he resided in a camp located in a hardship area within the meaning of sec. 913(a).

exclusion of the salary payments he received in 1980 and 1981 for his work in Saudi Arabia.

Neither the statute nor the pertinent regulations explain the meaning and intent of the exception to the foreign earned income exclusion for amounts paid by the United States. The legislative history of section 911 and the purpose of the exception in question have been discussed at length, however, in opinions of this and other courts. E.g., *McComish v. Commissioner*, 580 F.2d 1323, 1326 (9th Cir. 1978), revg. 64 T.C. 909 (1975); *Smith v. Commissioner*, 77 T.C. 1181, 1184-1185 (1981), affd. 701 F.2d 807 (9th Cir. 1983). The exception provided in the statute for amounts paid by the United States was designed to prevent U.S. Government employees from escaping taxation on their income by both the United States and the foreign governments. As explained in *Smith v. Commissioner, supra* at 1184-1185:

Congress first excluded foreign earned income from Federal income tax in 1926 (see sec. 213(b)(14), Revenue Act of 1926, ch. 27, 44 Stat. (Part 2) 26), in order to promote foreign trade and to place U.S. citizens residing abroad on an equal footing with foreign workers (see H. Rept. 1, 69th Cong., 1st Sess. 7 (1925); 75 Cong. Rec. 10410-10411 (1932), reprinted in J. Seidman, Legislative History of Federal Income Tax Laws, 1938-1861, at 472-473 (1938)). However, Congress recognized by 1932 that a blanket exclusion for foreign earned income provided an unjustifiable windfall for U.S. Government employees stationed in foreign countries who frequently paid neither Federal income tax (because of the statutory exclusion) nor foreign income tax (because foreign nations often do not tax the compensation of U.S. Government employees). See S. Rept. 665, 72d Cong., 1st Sess. 31 (1932), 1939-1 C.B. (Part 2) 496, 518; 75 Cong. Rec. 10410, *supra*. With an eye towards military personnel stationed at foreign bases, ambassadors, and foreign service workers (see 75 Cong. Rec. 10410, *supra*), Congress excepted from the foreign earned income exclusion those amounts "paid by the United States or any agency thereof" (see sec. 116(a), Revenue Act of 1932, Pub. L. 72-154, 47 Stat. 169), and that exception has remained a part of the Internal Revenue Code and forms the basis of the instant dispute. [Fn. ref. omitted.]

Prior to our decision in *Smith v. Commissioner, supra*, the critical factor in determining whether a taxpayer was subject to the exception applicable to individuals paid by the United States was whether the ultimate source of the funds used to pay the taxpayer was foreign or domestic. See *Erlandson v. Commissioner*, 277 F.2d 70 (9th Cir. 1960),

affg. a Memorandum Opinion of this Court; *Dowd v. Commissioner*, 37 T.C. 399 (1961); *Teskey v. Commissioner*, 30 T.C. 456 (1958). For example, in *Wolfe v. Commissioner*, 43 T.C. 572 (1965), revd. 361 F.2d 62 (D.C. Cir. 1966), the taxpayer was an employee of the Bureau of Public Roads within the U.S. Department of Commerce, and was assigned to work on a highway project in Iran on behalf of the Government of Iran. We held in *Wolfe* that the taxpayer was entitled to exclude from gross income payments. he received from the Bureau of Public Roads because the Government of Iran had prepaid to the United States the full cost of the highway project, including the taxpayer's salary and benefits. Because the ultimate source of the funds was the Government of Iran, we held that the taxpayer in *Wolfe* was not paid by the United States or any agency thereof within the meaning of section 911. *Wolfe v. Commissioner*, 43 T.C. at 579. We reached the same conclusion on identical facts in *Mooneyhan v. Commissioner*, 47 T.C. 693, 703-704 (1967), revd. 404 F.2d 522 (6th Cir. 1968).

Our decisions in *Wolfe* and *Mooneyhan* were, as noted, reversed on appeal. In *Commissioner v. Wolfe*, 361 F.2d 62 (D.C. Cir. 1966), revg. 43 T.C. 572 (1965), the Court of Appeals focused not on the ultimate source of the funds from which the taxpayer was paid, but adopted a broader facts and circumstances approach. In determining that the taxpayer in *Wolfe* had been paid by the United States, the Court of Appeals found three facts especially significant:

1. Taxpayer was an employee of the United States, who maintained unique status as such and who received unique benefits as such. * * *

2. The United States had the * * * sole obligation to pay taxpayer's salary, and his rights were only against the United States. * * *

3. A United States agency actually executed and delivered salary checks to the taxpayer. * * *

[*Commissioner v. Wolfe*, 361 F.2d at 64-65.]

The Court of Appeals in *Wolfe* also noted important "secondary facts" that supported the Commissioner's position. The taxpayer was exempt from all foreign income taxes and the taxpayer enjoyed a 10-percent increment over his base salary as a foreign post differential. The foreign government did not reimburse the United States for all of

the employee benefits paid to the taxpayer, and a U.S. bank incurred the credit risks associated with Iran's failure to pay for the project because Iran had used the proceeds of a loan from a U.S. bank to prepay the labor and construction costs of the project. *Commissioner v. Wolfe*, 361 F.2d at 65-66.

The Court of Appeals in *Wolfe* also stated—

We think the wording of the statute, the ordinary meaning of the words used, and the legislative history, all support the view that basically salaries of U.S. Government employees paid by the U.S. Government are not within the exemption. We see no basis for inserting a gloss that would make the tax exemption applicable where the Government receives reimbursement (here, not complete reimbursement) from another source having no direct relationship to employee-taxpayer. No difference in legislative intention should be ascribed to the fact that the reimbursement is secured by an advance deposit (here made with funds in turn advanced by the U.S. Government). [*Commissioner v. Wolfe*, 361 F.2d at 67.]

The facts and circumstances approach of the Court of Appeals for the D.C. Circuit in *Wolfe* expressly has been adopted and applied in other jurisdictions. See *Commissioner v. Mooneyhan*, 404 F.2d 522, 526-527 (6th Cir. 1968), revg. 47 T.C. 693 (1967); *Johnson v. United States*, 182 Ct. Cl. 593, 390 F.2d 715, 717 (1968); *United States v. Johnson*, 386 F.2d 824, 825 (5th Cir. 1967); *Wagner v. United States*, 628 F. Supp. 1184, 1187 (D. Colo. 1985) (involving facts identical to those herein, namely, an employee of the corps working in Saudi Arabia pursuant to the EAA); *Smith v. Commissioner*, 77 T.C. 1181, 1185-1186 (1981), affd. 701 F.2d 807, 809 (9th Cir. 1983).

In *Smith v. Commissioner, supra,* we expressly overruled our prior decisions in *Wolfe* and *Mooneyhan* to the extent they held that the ultimate source of the funds used to make the salary payments was critical in determining whether such amounts were paid by the United States within the meaning of section 911. *Smith v. Commissioner, supra* at 1187.

In spite of the above legal authority, petitioner contends that he should be regarded as having been paid by the Government of Saudi Arabia within the meaning of section 911 because Saudi Arabia had the legal obligation to pay his salary by prepayment thereof to the United States

either before commencement of the construction project at Ras al Mish'ab or at quarterly intervals throughout each year. Petitioner argues that the Government of Saudi Arabia exercised significant control over his daily working activities, that his employment relationship with the U.S. Government is not controlling, and that the United States was merely an agent of Saudi Arabia in issuing to petitioner his monthly paychecks. Lastly, because all agencies of the United States are forbidden to draw upon the U.S. Treasury unless funds have been appropriated therefor by Congress, and because funds drawn from the FMS trust fund to pay his salary were not appropriated by the Congress, petitioner argues that salary amounts he received could not have been paid by the U.S. Government.

After our review of the legislative history and the applicable judicial precedents, and after our careful examination of the facts of this case, we agree with respondent that the salary payments petitioner received for his employment in Saudi Arabia, for purposes of section 911, must be regarded as having been paid to petitioner by an agency of the U.S. Government. Accordingly, such payments are not excludable from petitioners' gross income under section 911.

As explained, the controlling facts on this issue are not who bears the ultimate economic burden of paying the taxpayer's salary; rather, the controlling facts are those that concern the payments to and the receipt by the taxpayer of the particular salary payments in question. At all times during his assignment in Saudi Arabia, petitioner was an employee of an agency of the U.S. Government. Salary payments he received are presumed to have been paid by his U.S. employer. *Smith v. Commissioner*, 701 F.2d 807, 809 (9th Cir. 1983); *United States v. Johnson*, 386 F.2d at 825; *Wagner v. United States*, 628 F. Supp. at 1187. Petitioner actually was paid by the corps' payroll center, and he was paid in U.S. dollars by means of U.S. Treasury checks.

Saudi Arabia had no obligation to directly pay petitioner his salary, and petitioner had no legal claim to receive his salary directly from Saudi Arabia. The Sixth Circuit stated in *Commissioner v. Mooneyhan*, 404 F.2d at 526—

To be entitled to the exclusion, there must be a direct relationship between the individual claiming it and his foreign employer; the absence of such a relationship defeats the claim. * * *

The legal obligation of Saudi Arabia under the EAA was to pay in advance to the United States all costs associated with EAA construction projects undertaken in Saudi Arabia. That payment obligation of Saudi Arabia ran to the United States, not to petitioner. See *Smith v. Commissioner*, 701 F.2d at 808; *Commissioner v. Wolfe*, 361 F.2d at 67. The United States cannot be considered a mere agent or paymaster acting on behalf of Saudi Arabia when it alone was obligated to compensate petitioner. *Johnson v. United States*, 390 F.2d at 717; *United States v. Johnson*, 386 F.2d at 825.

As we stated, petitioner argues that amounts paid to him out of the FMS trust fund could not have been paid to him by the United States within the meaning of section 911 because the funds in the FMS trust account were not appropriated by Congress and, indeed, were not the legal property of the U.S. Government. We disagree.

With limited exceptions not here applicable, all amounts credited to all of the U.S. Treasury trust funds, including the FMS trust fund, are appropriated funds. See 31 U.S.C. sec. 1321(b) (1982).[7] Moreover, the evidence in this case establishes that ownership of the funds deposited into the FMS trust account vested in the U.S. Government upon deposit therein.

Lastly, petitioner notes that the legislative intent of the foreign earned income exclusion of section 911 was to encourage U.S. citizens with technical, vocational skills to work abroad. See *Krichbaum v. United States*, 138 F. Supp. 515 (E.D. Tenn. 1956). Petitioner contends that as an engineer he is precisely the type of individual Congress intended to benefit from the foreign earned income exclusion, and that the exception to the exclusion was intended

[7] 31 U.S.C. sec. 1321(b) (1982), provides in part as follows:

(b) Amounts * * * that are analogous to the funds named in subsection (a) of this section and are received by the United States Government as trustee shall be deposited in an appropriate trust fund account in the Treasury. Amounts accruing to these funds (except to the trust fund "Soldiers' Home, Permanent Fund") are appropriated to be disbursed in compliance with the terms of the trust. Expenditures from the trust fund "Soldiers' Home, Permanent Fund" shall be made only under annual appropriations. Those appropriations are authorized to be made. [Act of Sept. 13, 1982, Pub. L. 97-258, sec. 1, 96 Stat. 919.]

to apply only to persons employed in intrinsically governmental jobs such as ambassadors, foreign service workers, and military personnel. See S. Rept. 665, 72d Cong., 1st Sess. 31 (1932), 1939-1 C.B. (Part 2) 496, 518; 75 Cong. Rec. 10410, 10411 (1932), reprinted in J. Seidman, Legislative History of Federal Income Tax Laws, 1938-1861, at 472-473 (1938). With regard to this argument, we reiterate that the particular job performed by a taxpayer is not a significant factor in determining whether amounts are paid by the United States. *Smith v. Commissioner*, 77 T.C. at 1185.

Respondent contends that under sections 7701(a)(39)[8] and 7482[9] appeal in this case would lie with the U.S. Court of Appeals for the D.C. Circuit because petitioner was a resident of Oman at the time of filing his and his wife's joint petition herein. Respondent therefore argues that under the *Golsen* rule,[10] we are bound to follow that court's decision in *Commissioner v. Wolfe, supra,* on the section 911 issue.

Petitioners argue that appeal in this case would lie with the Court of Appeals for the Fourth Circuit because petitioner Margaret J. Soboleski was at all times during the years in issue, as well as at the time the petition in this case was filed, a resident of the Commonwealth of Virginia. Petitioners also contend that petitioner Joseph N. Soboleski retained his marital residence with his wife in Virginia, although he temporarily resided abroad. *Brewin v. Commissioner,* 72 T.C. 1055 (1979), revd. and remanded on another issue 639 F.2d 805 (D.C. Cir. 1981). Petitioners therefore argue that our analysis in this case of the section 911 issue is not controlled by *Commissioner v. Wolfe, supra.*

---

[8]Sec. 7701(a)(39) provides:

(39) PERSONS RESIDING OUTSIDE UNITED STATES.—If any citizen or resident of the United States does not reside in (and is not found in) any United States judicial district, such citizen or resident shall be treated as residing in the District of Columbia for purposes of any provision of this title relating to—
    (A) jurisdiction of courts, or
    (B) enforcement of summons.

[9]Sec. 7482(a) provides:

(a) JURISDICTION.—The United States Court of Appeals shall have exclusive jurisdiction to review the decisions of the Tax Court, except as provided in section 1254 of Title 28 of the United States Code, in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury; and the judgment of any such court shall be final, except that it shall be subject to review by the Supreme Court of the United States upon certiorari, in the manner provided in section 1254 of Title 28 of the United States Code.

[10]*Golsen v. Commissioner,* 445 F.2d 985 (10th Cir. 1971), affg. 54 T.C. 742 (1970).

We previously have discussed this Court's adoption in *Smith v. Commissioner, supra,* of the facts and circumstances approach to the section 911 issue, and we have used that approach herein. There being no contrary prevailing precedent in the Fourth Circuit, we are free to utilize such an approach regardless of whether appeal herein will lie with the D.C. Circuit or with the Fourth Circuit.

*Decision will be entered for the respondent.*