LOUIS H. MOONEYHAN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2699–64, 2700–64. Filed March 29, 1967.

*Lowe Watkins*, for the petitioner.
*Charles G. Barnett*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's income tax for the calendar years 1959, 1960, 1961, and 1962 in the amounts of $1,952.15, $863.26, $2,634.22, and $2,063.32, respectively.

The issues for decision are:

(1) Whether petitioner is entitled to exclude from his gross income in each of the years here involved, under the provisions of section 911(a)(2) of the Internal Revenue Code of 1954,[1] the salaries he received while working in Iran as an employee of the Bureau of Public Roads, Department of Commerce, assigned to the Iran Division.

(2) If not otherwise entitled to such an exclusion, does the fact that respondent did not question an exclusion taken by petitioner purportedly under section 911(a)(2) for years he was employed in Ethiopia entitle petitioner to such exclusion?

(3) Was respondent prohibited from issuing a valid notice of deficiency to petitioner for the year 1960 because of previously having refunded to petitioner all amounts of tax withheld from his wages for that year?

(4) If petitioner is not entitled to exclude the salaries he received while working in Iran, is he entitled to a deduction as an ordinary and

---

[1] All references are to the Internal Revenue Code of 1954.

necessary business expense for the cost of his meals while he was working in Iran during the year 1959?

(5) If petitioner is not entitled to exclude in full the salaries he received while he was working in Iran, is he entitled to exclude from his gross income under section 912(1) the portion of the compensation he received which constitutes foreign differential allowances?

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is and at all times pertinent hereto was a citizen of the United States. He resided at the date of the filing of the petitions in these cases in Nashville, Tenn. He filed his individual Federal income tax returns for the calendar years 1959, 1960, and 1961 with the district director of internal revenue, Nashville, Tenn., and he filed his individual Federal income tax return for the calendar year 1962 with the Director of International Operations, Washington, D.C.

Prior to 1954, petitioner was engaged in construction work and road building for private contractors and as an employee of State governments. From some time in 1952 to some time in 1954 and again from some later date in 1954 to some time in 1956 petitioner was employed by the Bureau of Public Roads of the Department of Commerce (hereinafter referred to as the Bureau) in Ethiopia, Africa.

On September 22, 1957, the Bureau offered, and petitioner accepted, an "Excepted Appointment—Indefinite" under section 527(c)(1), Mutual Security Act of 1954 (now sec. 625(d), Foreign Assistance Act of 1961), and was assigned to the Iran Division as an equipment specialist, grade ICA–7. Petitioner arrived in Iran on September 29, 1957, and served in Iran pursuant to his appointment by the Bureau until September 29, 1959. On October 19, 1958, petitioner was promoted to equipment specialist, grade ICA–6. On September 29, 1959, petitioner left Iran and arrived in the continental United States on September 30, 1959. On November 3, 1959, he was separated from his employment by the Bureau in accordance with his voluntary resignation.

On June 13, 1960, the Bureau offered, and petitioner accepted, an excepted appointment under the same provisions of law as his prior appointment and was assigned to the Iran Division of the Bureau as an equipment specialist, grade ICA–6. Petitioner arrived in Iran on June 19, 1960, and served in that country until June 24, 1962, when he departed from Iran for the continental United States where he arrived on July 18, 1962. On August 17, 1962, pursuant to his voluntary resignation, petitioner was separated from his employment by the Bureau.

Petitioner was not serving in a competitive civil service status when he accepted the excepted position in 1957 or when he reentered the excepted service in 1960 and did not have any statutory or regulatory rights to reemployment in the competitive civil service. Petitioner while employed by the Bureau in the Iran Division was entitled as a Government employee to the benefits of the Federal laws governing performance ratings, incentive awards, Federal Employees Pay Act, annual and sick leave, unemployment compensation, and Federal Employees Group Life Insurance. He was not entitled to the benefits of the Federal Employees Health Insurance Act or to the Federal Employees Retirement Act.

Petitioner's assignment by the Bureau to Iran was in accordance with the terms of an agreement dated December 18, 1956, between the Imperial Government of Iran (hereinafter sometimes referred to as the Iranian Government) and the Bureau entitled, "General V. Ansari, Credit Assignment." This agreement was in the form of a letter addressed to General Vali Ansari, Minister of Roads and Communications, Imperial Government of Iran, by the Commissioner of Public Roads of the Bureau and was amended by a similar letter addressed to General V. Ansari, on behalf of the Bureau, dated August 2, 1960, which letter confirmed that except as amended the original agreement remained in effect. Both the original and amended agreements were confirmed on behalf of the Iranian Government. The agreement as amended will hereinafter be referred to as the letter agreement. The letter agreement referred to a credit agreement.

The credit agreement of December 7, 1956, referred to in the original letter agreement, provided for a loan by the Export-Import Bank of Washington to the Imperial Government of Iran in the sum of $5 million to assist Iran in financing the acquisition in the United States and exportation to Iran of highway equipment and a program of highway maintenance and training in Iran, together with the services of United States highway engineers and technicians in connection therewith, with the understanding that Iran would make arrangements with the Bureau whereby the Bureau would provide the services of United States engineers and technicians to assist in developing and carrying out the program of highway maintenance and training. Further similar credit agreements were entered into between the Export-Import Bank of Washington and the Iranian Government and the International Bank for Reconstruction and Development and the Iranian Government.

From September 22, 1957, until November 3, 1959, and from June 3, 1960, to December 25, 1960, petitioner worked on construction projects financed from the proceeds of the credit agreements between the

Export-Import Bank of Washington and the Iranian Government, and from December 25, 1960, until August 17, 1962, petitioner worked on road construction projects financed from the proceeds from credit agreements between the International Bank for Reconstruction and Development and the Iranian Government.

The letter agreement of December 18, 1956, provided that the objectives of the program were to achieve the maximum highway maintenance with the resources at the disposal of the Iranian Government while laying the foundations for a modern highway organization of well-trained personnel, properly equipped to carry out a continuing program of highway construction and maintenance in Iran. The agreement provided that in furtherance of these objectives the Bureau "is prepared to put its experience at your disposal, to assign the requisite personnel," and specifically to assist in preparing the general plan of highway maintenance, in developing and carrying out the program of highway maintenance, in selecting highway maintenance equipment, in procuring such items of equipment, and in recommending steps to reorganize the Highway Division of Iran. The letter agreement further provided that, "To perform the foregoing services, the Bureau will assign the following personnel," which included a division engineer and other engineers and technical specialists. The agreement provided that the division engineer would be in charge of all personnel of the Bureau assigned to Iran under the agreement and would provide direct liaison with the Minister of Roads of Iran. The letter agreement provided with respect to compensation of personnel assigned to Iran that the "compensation of all personnel of the Bureau assigned to Iran from the date of assignment to the date of separation from the program will be paid or reimbursed out of the Dollar Working Fund to be established by your Government as provided in Paragraph VII." Paragraph VII provided with respect to the Dollar Working Fund as follows:

To carry out the conditions of the $5,000,000 loan from the Export-Import Bank signed on December 7, 1956 your Ministry will establish a Dollar Working Fund in the maximum amount of $500,000 with the Bureau to be at the disposal of the Bureau for the payments as set out in this Agreement.

The Dollar Working Fund shall be established in the amount of $200,000 and shall be replenished by your Government from time to time upon the request of the Bureau accompanied by an itemized statement signed by an authorized representative of the Bureau setting forth all expenditures made therefrom which have not been reported in any previous itemized statement. With respect to each such expenditures, such statement shall specify the date, purpose and amount thereof and the name and address of the person or other entity receiving the same and shall be accompanied by such supporting documents as your Government may reasonably request.

Each such replenishment of the Dollar Working Fund by your Government shall be in an amount equal to the total of the expenditures set out in the itemized statement accompanying the request for replenishment. In connection with

any such replenishment of the Dollar Working Fund, your Government shall deposit therein such additional amount as the Bureau may recommend and your Ministry may approve to meet prospective expenditures from the Dollar Working Fund; provided, however, that the amount in the Dollar Working Fund at any one time shall not exceed $500,000.

Promptly following the last expenditure from the Dollar Working Fund, the Bureau will submit a final itemized statement signed as aforesaid setting out all expenditures made therefrom which have not been reported in any previous itemized statement and will return to your Government any balance in the Dollar Working Fund remaining after such last expenditure.

The letter agreement further provided that all expenses for office rental, Iranian stenographic and clerical help, transportation, and other out-of-pocket expenses incurred by personnel of the Bureau assigned to Iran should be paid or reimbursed by the Ministry of Roads of Iran. The agreement also carried a provision that the Government of Iran would grant exemption from all income taxes, duties, fees, and customs charges upon the compensation of personnel of the Bureau assigned to Iran and upon imports of household and personal effects, including automobiles, for the personal use of the employee or his dependents.

The 1960 amendment made some changes in the statement of the services to be rendered specifically stating in this respect as follows:

To assist in preparing the general plan of highway maintenance to be accomplished during the period and to assist in supervising its execution within the limits of authority as granted in writing from time to time by the Ministry of Roads. The Bureau of Public Roads shall not be responsible for any operation for which the authority to operate is not specifically delegated by the Ministry.

The agreement also made some changes in the personnel to be assigned by the Bureau to Iran and specified more precisely the local expenses to be paid by the Ministry of Roads of Iran and how these expenses were to be paid. This amendment provided that except for office rental, local air travel, and certain specified other items, the expenses should be paid from funds set up by the Ministry to the account of the Division Engineer of the Bureau, the account to be referred to as Division Engineer's Operating Fund, that quarterly payments should be made by Iran into this account, and that the division engineer should account for expenditures from this fund by statements submitted monthly to the Iranian Ministry of Roads. No other provisions of the original letter agreement were changed.

Pursuant to the terms of paragraph VII of the letter agreement, a Dollar Working Fund was established by the Iranian Government from the dollar proceeds of the various credit agreements. The Dollar Working Fund was established by checks drawn by the Iranian Government and made payable to the Bureau which were deposited with the U.S. Treasury Department and credited to Trust Fund Account 13X8502(02) entitled, "Technical Assistance United States Dollars Advanced From Foreign Governments, Bureau of Public Roads."

Certain expenses incurred by the Bureau in fulfilling its obligations under the letter agreement, including all salaries and allowances paid to petitioner while assigned to the Bureau's Iran Division, were either paid by direct charges against the Dollar Working Fund or were reimbursed therefrom. No funds credited to the Dollar Working Fund were appropriated by the Congress of the United States for salary expenses for Bureau personnel.

There was no agreement or requirement between petitioner and the Iranian Government or between petitioner and the Bureau that payment of petitioner's salary while assigned to the Bureau's Iran Division was dependent upon deposits of funds having first been made by the Iranian Government to the Dollar Working Fund or that payment of his salary while assigned to the Bureau's Iran Division was to be made out of Iranian funds. However, the Bureau's providing of the services of its Iran Division employees, including petitioner, under the letter agreement was contingent upon the deposit of such funds by the Iranian Government pursuant to the terms of the letter agreement.

All wages paid to petitioner while he was employed by the Iran Division of the Bureau were paid by U.S. Treasury Department checks issued to him every 2 weeks by the Bureau.

While assigned by the Bureau to its Iran Division, petitioner was under the direct supervision and control of a division engineer who was an employee of the Bureau and was in charge of all Bureau employees who were assigned to the Iran Division. Among other things, the division engineer assigned all the duties to personnel under him; wrote internal travel orders within the jurisdictional geographical area encompassed by the Iran Division; determined the post of assignment of each employee under his control; prepared standard efficiency reports for each employee under his control, which reports are required annually with respect to U.S. Government employees; approved leave requests; and recommended employees for promotion or other personnel action.

Neither the Iranian Government, nor any of its employees, was empowered to, or did, supervise or control the work of any of the employees of the Iran Division of the Bureau. The Iranian Government could not hire or fire any of the employees of the Iran Division or in any manner control the salary paid or promotions given to any of the Bureau's employees assigned to the Iran Division.

Petitioner's tours of duty with the Bureau's Iran Division were all 2-year agreements but petitioner could have extended his tours beyond their 2-year duration if he had desired to do so.

During the year 1959 while he was in Iran, petitioner maintained a home in Nashville, Tenn., where his wife resided.

While in Iran in 1959, petitioner incurred and paid costs of approximately $3 a day for meals and paid a cook $40 a month to prepare his meals.

During the calendar years 1959, 1960, 1961, and 1962, petitioner received wages under his employment agreements with the Bureau for work performed in Iran in the amount of $9,673.86, $5,210.52, $11,583, and $9,043.17, respectively. These wages included base salary plus foreign differentials in the amounts of $1,555.88, $592.92, $2,055, and $1,355.50 for the calendar years 1959, 1960, 1961, and 1962, respectively. Withholding taxes were deducted from petitioner's wages for the taxable years 1959, 1960, 1961, and 1962 in the amounts of $1,516.80, $877.05, $1,963.23, and $1,534.54, respectively.

Petitioner on his Federal income tax return for each of the years 1959, 1960, 1961, and 1962 reported and claimed the entire amount of wages received by him from the Bureau for work performed while he was in Iran as being excludable from gross income under section 911(a)(2) and claimed a refund for the entire amount of income taxes which had been withheld. No refund was made of any amount of taxes withheld pursuant to these claims except for the year 1960. On June 19, 1961, petitioner received a refund of the $877.05 which had been withheld from his 1960 wages. No suit has been brought by the United States or respondent for recovery of the refund made to petitioner, or any action taken thereon except the issuance of the notice of deficiency on March 27, 1964, from which the petition in this case for the year 1960 was filed.

Respondent in his notices of deficiency for the years involved increased petitioner's reported income by the wages he received from the Bureau for work performed in Iran with the explanation as to each year that it was determined that the wages paid to him by the Bureau constituted taxable income and in the notice of deficiency for the year 1960, the further explanation, "Since you were an employee of the United States government, the amount is not exempt from taxation under section 911 of the Internal Revenue Code."

### OPINION

Under section 911(a)(2),[2] an individual citizen of the United States, who during any period of 18 consecutive months is present in a foreign

---

[2] SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.

(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

\* \* \* \* \* \*

(2) PRESENCE IN FOREIGN COUNTRY FOR 17 MONTHS.—In the case of an individual citizen of the United States, who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or an agency thereof) if such amounts constitute earned income (as defined in subsection (b)) attributable to such period; but such individual shall not be allowed as a deduction from his gross income any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts

country during at least 510 full days in such period is not required to include in his gross income earned income received from sources without the United States (except amounts paid by the United States or an agency thereof).

Petitioner is a U.S. citizen and was present in Iran during the requisite period for each of the years here in issue. The income which he seeks to exclude from his gross income in each such year is income earned by him from services rendered in Iran. Because of these facts respondent recognizes that petitioner is entitled to the exclusion he claims unless his salary during his employment in Iran was paid by the United States or any agency thereof.

It is respondent's position that petitioner was paid by the United States or an agency thereof because he was an employee of the United States, he was supervised by an employee of the United States, and his salary was paid to him by U.S. Treasury checks issued every 2 weeks by an agency of the United States. Respondent relies on the employer-employee relationship existing between an agency of the United States and petitioner as placing the legal obligation to pay petitioner's salary only upon that agency and contends that since this legal obligation was discharged by that agency by issuance of U.S. Treasury checks, the source of the funds to provide for the payment is immaterial.

Petitioner contends that since he was assigned by the Bureau to Iran under the letter agreement between Iran and the Bureau which specifically provided for such assignment, the nature of his employment and by which government his salary was paid should be determined from the terms of the letter agreement. Petitioner contends that the substance of the letter agreement was that employees assigned thereunder were on loan from the Bureau to Iran and were paid by U.S. Treasury checks issued by the Bureau only because under the letter agreement, the Bureau was acting as the agent of Iran in making the payments. Petitioner points specifically to the provision of the letter agreement that "the compensation of all personnel of the Bureau assigned to Iran * * * will be paid or reimbursed out of" funds deposited by Iran with the U.S. Treasury Department and credited to a trust fund account, as supporting his position that his salary was "paid" by Iran by the check of its agent, the U.S. Treasury acting through the Bureau.

The position taken by respondent is in substance a summary of the reasoning of the U.S. Court of Appeals for the District of Columbia

---

excluded from gross income under this paragraph. If the 18-month period includes the entire taxable year, the amount excluded under this paragraph for such taxable year shall not exceed $20,000. If the 18-month period does not include the entire taxable year, the amount excluded under this paragraph for such taxable year shall not exceed an amount which bears the same ratio to $20,000 as the number of days in the part of the taxable year within the 18-month period bears to the total number of days in such year.

in its opinion in *Commissioner* v. *Wolfe*, 361 F. 2d 62 (C.A.D.C. 1966), reversing 43 T.C. 572. Petitioner's primary position is that our opinion in *Eldon E. Wolfe*, 43 T.C. 572 (1965), reversed by *Commissioner* v. *Wolfe*, and the dissenting opinion of Judge Fahy in *Commissioner* v. *Wolfe*, stressing the importance of the source of the funds from which payment is made are a proper interpretation of the statute.

Petitioner also attempts to distinguish the facts involved in *Eldon E. Wolfe*, *supra*, from those in this case by pointing out that he, unlike Wolfe, was not a regular civil service employee prior to accepting a position in Iran in an "expected" position and that he did not have the civil service retirement rights and Government health benefits that Wolfe had. In our view the factual distinctions are not controlling. Petitioner had the same type of employment as did the taxpayer in the *Wolfe* case except for certain rights Wolfe had acquired because of being in the classified civil service prior to being appointed to an "excepted" position.

As we pointed out in *Laurence P. Dowd*, 37 T.C. 399, 408 (1961), the exclusion of the statute is inapplicable to amounts "paid by the United States or an agency thereof" and this inapplicability is not dependent on an employer-employee relationship. The existence of such a relationship and the nature of this relationship are important only to the extent that these facts tend to establish by whom the taxpayer was paid. The nature of the retirement and health benefits to which a taxpayer is entitled are relatively unimportant aspects of such taxpayer's employment in determining by whom such taxpayer was paid although it might be that an employee who had such benefits would receive the Government portion of the payments as amounts paid by the United States even though his salary were not otherwise paid by the United States. Petitioner did not have these benefits but did have Government insurance benefits. However, only direct salary payments are here in issue. Therefore, the basic question here is whether Iran or the United States, through the Bureau, paid petitioner's salary. In *Johnson* v. *United States*, an unreported case (M.D. Ala. 1966, 17 A.F.T.R. 2d 656, 66–2 U.S.T.C. par. 9575), now on appeal (C.A. 5, July 14, 1966), the facts were identical to those in *Eldon E. Wolfe*, *supra*, and the District Court, based to a large extent on our opinion in *Eldon E. Wolfe* and the opinion in *Krichbaum* v. *United States*, 138 F. Supp. 515 (E.D. Tenn. 1956), reached the conclusion that the taxpayer's salary had not been paid by the United States or an agency thereof.

Respondent in the instant case attempts to distinguish *Krichbaum* v. *United States* on the ground that the provisions of the agreement between Ethiopia and the Bureau under which the taxpayer in *Krichbaum* v. *United States* worked in Ethiopia differed from the provisions of the agreement between Iran and the Bureau under which petitioner

and the taxpayers in *Eldon E. Wolfe* and *Johnson v. United States* were assigned to work in Iran. Respondent states that the obligation to pay the salaries of personnel assigned to Ethiopia by the Bureau in accordance with the agreement between the Bureau and Ethiopia was assumed by the Ethiopian Government whereas under the letter agreement between Iran and the Bureau, Iran did not assume this obligation. While the language of the agreement between Ethiopia and the Bureau differs in certain respects from that of the letter agreement between Iran and the Bureau, the substance of the provisions contained in the two agreements providing for compensation of Bureau personnel to be paid from funds supplied by the foreign government is the same. The Court of Appeals in *Commissioner v. Wolfe, supra,* did not consider *Krichbaum v. United States, supra,* to be distinguishable but stated in its opinion that the case was incorrectly decided. The Court of Appeals in *Commissioner v. Wolfe* stressed the employer-employee relationship between the taxpayer and the United States as supporting the conclusion that the taxpayer was "paid" by the United States. In reaching this conclusion the court pointed to the legislative history of the addition to the section dealing with the exclusion of the words, "except amounts paid by the United States or an agency thereof." [3] The Court of Appeals stated (361 F. 2d at 66):

On the floor, Senator Reed disagreed with the Committee on abolishing the exemption entirely, and proposed the exception for United States employees. His views ultimately won out. Senator Reed stated that the purpose of the exemption generally was to avoid double taxation of Americans working abroad, and to put them "in a position of equality with their competitors," but that this was wholly inapplicable to Government employees. (See 75 Cong. Rec. 10410):

"We discovered that the provision had been stretched to the point of exempting an American naval officer or army officer who was stationed, let us say,

---

[3] S. Rept. No. 665, 72d Cong., 1st Sess. (1932), 1939–1 C.B. (Part 2) 496, 518:

SECTION 116. EXEMPTION OF EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES

This section has been amended by the elimination of the subsection excluding from gross income amounts received by bona fide nonresidents of the United States from sources without the United States. Your committee believes there is no reason for the continuance of this exemption in the case of citizens of the United States residing abroad for the reason that under other sections of the Act such citizens are granted a credit for income taxes paid foreign countries and should not be further relieved from Federal income taxes. Furthermore, a considerable proportion of the individuals previously benefited by this subsection have been employees of the United States who, because of their status as such, were usually exempt from any foreign tax upon their compensation received from the United States; these citizens are not believed by your committee to be entitled to a complete exemption from the Federal income tax upon such compensation.

H. Rept. No. 1492, 72d Cong., 1st Sess. (1932), 1939–1 C.B. (Part 2) 539–543:

Amendment No. 59: This amendment eliminates the exclusion from gross income, in the case of a nonresident individual citizen, of earned income from sources without the United States; and the House recedes with an amendment which restores the exclusion except as to amounts paid by the United States or any agency thereof, and makes clerical changes.

in the embassy in London or in some foreign country, like our troops in China. Those people were getting complete exemption from the American income tax. We discovered further, to our surprise, that it had been held that American ambassadors and ministers and officers of the Foreign Service were getting clear out of the payment of any income tax by virtue of the same provision, which nobody in the world ever intended when the provision was first adopted. These people do not deserve the exemption, because they are not subject to the income taxation of the foreign countries in which they are stationed, any more than we would tax the British ambassador here in Washington on his income."

Taxpayer Wolfe's position clearly falls within the scope of the legislative purpose of the exception. He was a Government employee, and he was not subject to income tax by Iran. The agreement by Iran not to subject him to income tax confirms what would be the normal practice with respect to an employee of a foreign government.

In our decision in *Eldon E. Wolfe, supra,* we concluded, as did the courts in *Krichbaum* v. *United States, supra,* and *Johnson* v. *United States, supra,* that the important fact was by whom the taxpayer was "paid" as distinguished from by whom he was employed. In our opinion in *Eldon E. Wolfe,* we relied on *Leif J. Sverdrup,* 14 T.C. 859 (1950); *Robert W. Teskey,* 30 T.C. 456 (1958); *Laurence P. Dowd, supra;* and *Erlandson* v. *Commissioner,* 277 F. 2d 70 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court, in each of which the taxpayer was considered to have been "paid" by the United States to a large extent because the funds with which his salary was paid were furnished by the United States. The taxpayers in *Robert W. Teskey* and *Erlandson* v. *Commissioner* were each employed on ships owned by the United States but operated by private corporations hiring personnel and paying them with checks drawn on bank accounts in the name of such private corporation from funds received from the U.S. Government for the purpose of paying such salaries. In those cases we and the Court of Appeals held that the private corporation was operating the ship merely as an agent of the United States and that the payment to the taxpayer by the agent of the United States was a payment by the United States or an agency thereof. In *Erlandson* v. *Commissioner, supra,* the court noted with respect to the funds from which the taxpayer was paid (277 F. 2d at 72):

The company deposited the funds as received in a bank account under its own name. No provision was made for a trust account, but it is not contended that these monies were commingled with the other funds of the company. The checks given to Erlandson for his services were drawn upon this bank account and were signed by the company as drawer.

Upon a consideration of all the aspects of the agreement between the Bureau and Iran and with due consideration to the legislative history underlying the various amendments to the section providing for the exclusion from gross income of income earned by U.S. citizens

abroad,[4] we adhere to our opinion in *Eldon E. Wolfe, supra*, and respectfully decline to follow the opinion of the majority of the Court of Appeals in *Commissioner* v. *Wolfe, supra*.

Our conclusion that petitioner was paid by Iran with the Bureau acting on behalf of Iran in making these payments is based upon the overall agreement between Iran and the Bureau as contained in the letter agreement of December 18, 1956, as amended by the letter of August 2, 1960. As we have set forth in our findings, this agreement provided for the assignment of specified personnel by the Bureau to perform services as set forth in the agreement, which services were services within the limits of authority granted by the Iranian Government. Certain local expenditures such as per diem for local travel of employees and the furnishing of transportation were to be paid directly by Iran or under the agreement as amended to the division engineer in Iran and by the division engineer to such employees as might be entitled to the payment. These provisions indicate that in effect the Bureau employees were on loan to Iran even though not supervised directly by officials of Iran. The agreement specifically provided that the compensation of all personnel of the Bureau assigned to Iran would be paid or reimbursed out of the Dollar Working Fund, which Dollar Working Fund was a fund supplied by Iran from loans it secured from the Export-Import Bank or from the International Bank for Reconstruction and Development. The position of the Bureau under its agreement with Iran was substantially the same as the position of the U.S. Education Commission in Japan involved in *Laurence P. Dowd, supra*, and of the private corporations operating the ships under their agreements with the U.S. Government in the cases

---

[4] In addition to the Committee reports from which we quoted in fn. 3, see S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 504, 548:

INCOME FROM SOURCES WITHOUT THE UNITED STATES IN CERTAIN CASES

Under section 116(a) of the Internal Revenue Code a citizen of the United States residing outside the United States more than six months during the taxable year is exempt from tax on his earned income from sources outside of the United States, except in the case of income paid by the United States or any of its agencies. This provision of the present law has suffered considerable abuse in the case of persons absenting themselves from the United States for more than six months simply for tax-evasion purposes. To stop this abuse, the House bill repealed section 116(a).

From cases brought to your committee's attention, the complete elimination of this section would work a hardship in the case of citizens of the United States who are bona fide residents of foreign countries. For example, many employees of American business in South America do not return to the United States for periods of years. Such persons are fully subject to the income tax of the foreign country of their residence. Your committee has adopted a provision which it is believed will effectively terminate the abuse of this section but at the same time will not unduly penalize our citizens who are bona fide residents of foreign countries. It provides that if such citizens establish that they are bona fide residents of a foreign country during the entire taxable year their earned income from sources without the United States will be exempt. If they have been residents of a foreign country for two years or more, this same treatment will be accorded them for the year in which they return to the United States.

See also S. Rept. No. 781, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 458, 495, which states:

Section 116(a) of the Code exempts from income tax citizens of the United States who are bona fide residents of a foreign country with respect to income earned outside the United States, and disallows deductions chargeable against this income. This provision

of *Robert W. Teskey, supra,* and *Erlandson* v. *Commissioner, supra.* Applying the same reasoning as we applied to conclude that the taxpayers in those cases were paid by the United States or an agency thereof, we conclude that petitioner in the instant case was paid by Iran and not by the United States or an agency thereof.

In view of our decision of the primary issue in this case, we do not reach petitioner's alternative contention.

Reviewed by the Court.

*Decisions will be entered for petitioner.*

---

TANNENWALD, *J.,* dissenting: I believe that in determining whether to follow the decision of the Court of Appeals in *Commissioner* v. *Wolfe,* 361 F. 2d 62 (C.A.D.C. 1966), the majority has been unnecessarily inhibited by prior decisions construing the language "except amounts paid by the United States or an agency thereof" contained in section 911(a)(2). Granted that there may be uncertainties in the applicability of the statutory exception in other situations, the legislative history reveals that Congress intended that employees of the U.S. Government who were bona fide residents of a foreign country should continue to be subject to U.S. income tax. See S. Rept. No. 665, 72d Cong., 1st Sess. (1932), p. 31, 1939–1 C.B. (Part 2) 496, 518; 75 Cong. Rec. 10410. And, at the time the 18-month presence-in-a-foreign-country rule was engrafted on the statute in 1951, Congress included the same language of exception and specifically indicated that it realized that it was doing so. H. Rept. No. 1213, 82d Cong., 1st Sess. (1951), p. 77, 1951–2 C.B. 622, 630.

---

is intended both to encourage citizens to go abroad and to place them in an equal position with citizens of other countries going abroad who are not taxed by their own countries.

However, the present law has two defects which section 321 of your committee's bill corrects. First, the exclusion is allowed only with respect to an "entire taxable year" with respect to which the individual is a bona fide resident of the foreign country. Thus, exemption is denied an individual in his first year abroad unless he becomes a bona fide resident of the foreign country as of January 1. Section 321 of your committee's bill corrects this defect of present law by granting the exclusion with respect to "an uninterrupted period which includes an entire taxable year" with respect to which an individual was a bona fide resident of a foreign country.

In addition, the term "bona fide" residence abroad has been construed quite strictly with the result that many persons who have gone abroad to work even for a relatively long period of time have been unable to meet the test of a "bona fide resident" of a foreign country. Sometimes this has occurred because the nature of the individual's work is such as to make it difficult to establish a "residence" in the more widely accepted use of the term. On other occasions it has resulted from the fact that individuals have gone abroad only for a stated period of time. Examples of this are managers, technicians, and skilled workmen who are induced to go abroad for periods of 18 to 36 months to complete specific projects. Your committee believes, in accord with the point 4 program, that it is particularly desirable to encourage men with technical knowledge to go abroad. As a result your committee has added a paragraph to section 116(a) of the Code providing that income earned abroad by a citizen of the United States who is present in a foreign country or countries for 17 out of 18 consecutive months is to be excluded from income, and that deductions chargeable to such income will be disallowed in computing his Federal income tax.

These two changes made by your committee's bill are effective with respect to taxable years beginning after December 31, 1950.

I have no quarrel with the majority conclusion that the United States was a paymaster of the funds. My difficulty stems from the fact that the majority test stops there and makes taxability depend upon whether or not there is a trust fund or whether the reimbursement is pursuant to an anterior obligation or comes after the fact. To me, the test of taxability should not turn solely upon such fine points. To the extent that our earlier decision in *Eldon E. Wolfe*, 43 T.C. 572 (1965), reversed by *Commissioner* v. *Wolfe, supra*, holds otherwise, I would not follow it and would adopt the reasoning of the Court of Appeals. Cf. Rev. Rul. 54–483, 1954–2 C.B. 168, where respondent ruled that employees of contractors with the United States residing abroad were not covered by the exception and were entitled to the benefit of the exclusion, even though their compensation was paid directly by the U.S. Government. Cf. also Rev. Rul. 67–85, I.R.B. 1967–12, 5.

Clearly, in this case the United States was much more than a paymaster of the funds. Moreover, the Bureau of Public Roads was not a mere recruiter of personnel for the Government of Iran. There can be no serious argument that petitioner herein lacked the status of an employee of the Bureau. He worked on a project for which the Bureau had contracted its services and he was under the direct supervision of the division engineer, who, as an employee of and on behalf of the Bureau, was the primary instrument for seeing that the Bureau's responsibilities were properly discharged.

To be sure, he was not a regular civil service employee, but he was entitled to the benefit of several laws applicable to employees of the Federal Government—albeit not including those providing health insurance or retirement benefits. Beyond this, petitioner obtained the distinct advantage that the U.S. Government was responsible for the payment of his salary in dollars.[1] By means of an excepted appointment, petitioner avoided all the risks of change of government, convertibility, and devaluation which would have existed if he had accepted employment directly by the Government of Iran. Having chosen to obtain these benefits (as well as the benefit of being relieved of taxation by Iran), petitioner should not be heard to complain.

In 1932, when the exception first entered the law, Congress concededly was thinking only of full-time, regular employees of the United States. The unquestioned need for incentives to enable the Federal Government to recruit personnel to help implement our foreign economic policy came at least 15 years later. It may well be that these incentives should include the tax benefit which petitioner herein claims.

---

[1] I doubt that, if the Government of Iran had failed to honor its obligations to the Dollar Working Fund, petitioner could have been denied the right to be paid his salary between the time of such default and the actual termination of petitioner's services by the Federal Government.

But the applicable statute does not differentiate between types of Federal employees and I do not think that we should draw distinctions based upon a legislative history which fails to take into account a then nonexistent problem. Nor do I think that congressional silence over the years should be turned into an affirmative blessing of the majority result, a suggestion advanced by Judge Fahy in his dissenting opinion in *Commissioner* v. *Wolfe*. See 361 F. 2d at 69. This is particularly true where every decision on the point prior to 1964 (when Congress last dealt with sec. 911), with the single exception of a District Court decision (*Krichbaum* v. *United States*, 138 F. Supp. 515 (E.D. Tenn. 1956)), imposed taxability.[2] Nor do I think it without significance that the legislative trend since 1951 has been steadily to narrow the exclusion for earned income from sources without the United States. Technical Changes Act, 67 Stat. 615 (1953), sec. 204 (a); Revenue Act of 1962, Pub. L. 87–834, 76 Stat. 960, sec. 11; Revenue Act of 1964, Pub. L. 88–272, 78 Stat. 19, sec. 237 (a).

In all the decided cases, except the most recent, there was a coalescence (either directly or in the capacity of a principal of a disclosed agent) of the appointing authority, the obligor of payment, and the ultimate provider of the funds. Perhaps where the status of the taxpayer as an employee of the United States does not exist or is in doubt, additional elements of the situation should be examined. But this is not our case. Where the taxpayer is clearly such an employee and receives his paycheck from the United States, I think we should look no further.

PIERCE and DRENNEN, *JJ.*, agree with this dissent.

---

[2] *Erlandson* v. *Commissioner*, 277 F. 2d 70 (C.A. 9, 1960); *Laurence P. Dowd*, 37 T.C. 399 (1961); *Robert W. Teskey*, 30 T.C. 456 (1958); *Leif J. Sverdrup*, 14 T.C. 859 (1950).