Joseph T. Smith and Marie A. Smith, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 4805–79, 16171–79.     Filed November 30, 1981.

Joseph T. Smith, pro se.
*G. J. Beaudoin,* for the respondent.

OPINION

TANNENWALD, *Chief Judge*: Respondent has determined deficiencies in petitioners' Federal income tax for the calendar years 1975 and 1976 in the respective amounts of $4,495 and $4,948.78. The sole issue for decision is whether petitioners are entitled to exclude from their gross income amounts received by Joseph T. Smith as overtime pay while employed by the U.S. Customs Service in the Bahamas.

All of the facts have been stipulated and are so found.

Petitioners are husband and wife who resided in Sunnyvale, Calif., at the time the petitions herein were filed. They timely filed their joint Federal income tax returns for 1975 and 1976 with the Internal Revenue Service Center in Philadelphia, Pa., and Fresno, Calif., respectively. Marie A. Smith is a party to this proceeding solely by virtue of having filed joint income tax returns with her husband; consequently, Joseph T. Smith will hereinafter be referred to as petitioner.

Petitioner is a customs inspector (civil service employee) with the U.S. Customs Service (hereinafter referred to as customs). From September 7, 1974, through September 11, 1976, he was employed at a customs preclearance station in Nassau, Bahamas. The purpose of a preclearance station is to facilitate the customs clearance of passengers and baggage into the United States. The petitioner was physically present in the Bahamas for more than 510 days during 18 consecutive months of this period.

Frequently, airlines request the services of customs inspectors during their normal off-duty hours at preclearance stations to process passengers and baggage for flights departing directly for the United States (these services will hereinafter sometimes be referred to as overtime). In order for such a request to be granted, the airline must deposit money or post a

bond sufficient to insure payment for the services provided. This requirement is mandated by statute. See 19 U.S.C. secs. 267, 1451 (1976). Section 267 of title 19 provides in pertinent part:

Sec. 267. Compensation for overtime services; fixing working hours

The Secretary of the Treasury shall fix a reasonable rate of extra compensation for overtime services of customs officers and employees. * * * The said extra compensation shall be paid by the master, owner, agent, or consignee of such vessel or other conveyance whenever such special license or permit for immediate lading or unlading or for lading or unlading at night or on Sundays or holidays shall be granted to the appropriate customs officer, who shall pay the same to the several customs officers and employees entitled thereto according to the rates fixed therefor by the Secretary of the Treasury. * * *

Section 1451 of title 19 provides in pertinent part:

Sec. 1451. Extra compensation

Before any such special license to unlade shall be granted, the master, owner, or agent of such vessel or vehicle, or the person in charge of such vehicle, shall be required to deposit sufficient money to pay, or to give a bond in an amount to be fixed by the Secretary conditioned to pay, the compensation and expenses of the customs officers and employees assigned to duty in connection with such unlading at night or on Sunday or a holiday, in accordance with the provisions of section 267 of this title. * * * Upon a request made by the owner, master, or person in charge of a vessel or vehicle, or by or on behalf of a common carrier or by or on behalf of the owner or consignee of any merchandise or baggage, for overtime services of customs officers or employees at night or on a Sunday or holiday, the appropriate customs officer shall assign sufficient customs officers or employees if available * * * , but only if the person requesting such services deposits sufficient money to pay, or gives a bond in an amount to be fixed by * * * such customs officer, conditioned to pay the compensation and expenses of such customs officers and employees * * * . At ports of entry and customs stations * * * , between the United States and Canada or between the United States and Mexico, the appropriate customs officer, under such regulations as the Secretary of the Treasury may prescribe, shall assign customs officers and employees to duty at such times during the twenty-four hours of each day, including Sundays and holidays * * * ; but all compensation payable to such customs officers and employees shall be paid by the United States * * *

Upon completion of an overtime assignment, a customs inspector prepares a work ticket which identifies the employee, where and for whom the services were provided, a reference to account for money received as payment for the service, and a surety number of the insurer guaranteeing

payment of the overtime charge. When customs receives the completed work ticket, it prepares a bill for the airline to secure payment for the overtime services.

A customs employee assigned to work overtime remains at all times an employee of the United States, under the sole control and supervision of customs. The airline has no authority to hire or fire a customs inspector, nor does it exercise any control over compensation or promotions given to an inspector. All amounts paid to customs employees, including overtime pay, are in the form of U.S. Government checks, issued by the Treasury Department. These checks are delivered by customs, which has the sole obligation to pay an inspector's salary. Any credit risk for failure of an airline to repay the cost of overtime services of customs employees is borne by the U.S. Government.

During 1975, petitioner earned wages of $27,779.84, of which $12,282.80 represented overtime pay. In 1976, his wages were $26,864, of which $7,677 represented compensation for overtime services. Petitioner excluded from his gross income all amounts received as overtime pay for the years in issue.[1] Respondent has determined that these amounts were improperly excluded from petitioners' income.

The issues presented in this case are: (1) Whether petitioner's overtime pay attributable to services performed while he resided in the Bahamas is excludable from his gross income pursuant to the general exclusion of section 911(a)(2)[2] or whether it falls within the exception to that exclusion applicable to "amounts paid by the United States or any agency thereof" (see sec. 911(a)(2));[3] (2) if the overtime is not excludable, whether section 911(a)(2), as it applies to petitioner, is unconstitutional.

Congress first excluded foreign earned income from Federal income tax in 1926 (see sec. 213(b)(14), Revenue Act of 1926, ch.

---

[1]Due to an Internal Revenue Service error, the amount of exempt earned income was raised from $7,677 to $13,826, resulting in a refund for petitioners in 1976 of $3,630.78.

[2]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[3]Respondent concedes that petitioner has satisfied all other prerequisites to exclusion imposed by sec. 911. On the other hand, petitioner concedes that customs is an agency of the U.S. Government within the meaning of sec. 911(a)(2).

27, 44 Stat. (Part 2) 26), in order to promote foreign trade and to place U.S. citizens residing abroad on an equal footing with foreign workers (see H. Rept. 1, 69th Cong., 1st Sess. 7 (1925); 75 Cong. Rec. 10410–10411 (1932), reprinted in J. Seidman, Legislative History of Federal Income Tax Laws, 1938–1861, at 472–473 (1938)). However, Congress recognized by 1932 that a blanket exclusion for foreign earned income provided an unjustifiable windfall for U.S. Government employees stationed in foreign countries who frequently paid neither Federal income tax (because of the statutory exclusion) nor foreign income tax (because foreign nations often do not tax the compensation of U.S. Government employees). See S. Rept. 665, 72d Cong., 1st Sess. 31 (1932), 1939–1 C.B. (Part 2) 496, 518; 75 Cong. Rec. 10410, *supra*. With an eye towards military personnel stationed at foreign bases, ambassadors, and foreign service workers (see 75 Cong. Rec. 10410, *supra*), Congress excepted from the foreign earned income exclusion those amounts "paid by the United States or any agency thereof" (see sec. 116(a), Revenue Act of 1932, Pub. L. 72–154, 47 Stat. 169), and that exception has remained a part of the Internal Revenue Code and forms the basis of the instant dispute.[4]

Petitioner concedes—and there could be no serious arguments to the contrary—that his regular pay constitutes an amount paid by an agency of the U.S. Government within the meaning of the parenthetical exception contained in section 911(a)(2). Yet, petitioner argues that his overtime pay should be treated differently, even though it was for precisely the same types of services performed under precisely the same conditions as generated his regular compensation: petitioner was paid by U.S. Treasury check for customs preclearance, was at all times an employee of the United States, was under the direction and control of the United States, could be hired and fired only by customs, and could look only to the United States in case of nonpayment. The difference in treatment, so petitioner alleges, follows from the statutory requirement that an airline desiring petitioner's overtime services must guaran-

---

[4] See also *Krichbaum v. United States*, 138 F. Supp. 515 (E.D. Tenn. 1956), for a more detailed review of the pertinent legislative history.

tee in advance that it will reimburse customs for petitioner's overtime salary.[5] See p. 1183 *supra.*

Petitioner cites *Mooneyhan v. Commissioner,* 47 T.C. 693 (1967), revd. 404 F.2d 522 (6th Cir. 1968), for the proposition that we should treat his overtime pay as "paid by" the airlines within the meaning of section 911(a)(2) because that section speaks to the *source* of a taxpayer's salary rather than to his employer. See also *Wolfe v. Commissioner,* 43 T.C. 572 (1965), revd. 361 F.2d 62 (D.C. Cir. 1966); *Krichbaum v. United States,* 138 F. Supp. 515 (E.D. Tenn. 1956). Petitioner also relies upon an inference which he claims can be drawn from *Erlandson v. Commissioner,* 277 F.2d 70 (9th Cir. 1960), affg. a Memorandum Opinion of this Court, where funds were treated as paid by U.S. Government agencies even though the agencies were not the taxpayer's nominal employers. See also *Teskey v. Commissioner,* 30 T.C. 456 (1958).

While it is true that the application of section 911(a) does not necessarily turn on an employer/employee relationship (see *Dowd v. Commissioner,* 37 T.C. 399, 406 (1961); *Sverdrup v. Commissioner,* 14 T.C. 859, 865 (1950)), it is also true that when there *is* such a relationship, one's salary usually comes from one's employer and the existence of such a relationship is a significant factor. See *United States v. Johnson,* 386 F.2d 824 (5th Cir. 1967); *Erlandson v. Commissioner, supra* at 72. When we have looked through a third-party payor to see the U.S. Government as the true source of funds, we have done so when the third party was a disbursing agent of the United States. See *Erlandson v. Commissioner, supra; Dowd v. Commissioner, supra; Teskey v. Commissioner, supra.*

We have held that employees of the Bureau of Public Roads of the U.S. Department of Commerce may exclude their salaries pursuant to section 911(a) because their U.S. Treasury pay checks were "paid" with funds deposited by Iran (see *Mooneyhan v. Commissioner, supra; Wolfe v. Commissioner, supra*), although other courts have almost uniformly disagreed. *Commissioner v. Mooneyhan,* 404 F.2d 522 (6th Cir.

---

[5]The parties agree, however, that the U.S. Customs Service had the "primary and sole obligation to pay" the petitioner and that the U.S. Government "assumes the credit risk that the private party might not repay the cost of overtime services of Customs employees." Thus, petitioner could not seek payment from the airlines or their bonding agencies

1968), revg. 47 T.C. 693 (1967); *United States v. Johnson, supra*; *Commissioner v. Wolfe*, 361 F.2d 62 (D.C. Cir. 1966), revg. 43 T.C. 572 (1965); *Johnson v. United States*, 182 Ct. Cl. 593, 390 F.2d 715 (1968).[6]

In the instant case, petitioner was at all times performing U.S. Customs inspection for the U.S. Government. That is an intrinsically governmental function (see 19 U.S.C. sec. 6 (1976)), performed exclusively under Government auspices (see 18 U.S.C. sec. 209(a) (1976)). Cf. *United States v. Myers*, 320 U.S. 561, 567 (1944). In the very real sense, it can be said that petitioner occupies a different position from the taxpayers in *Mooneyhan, Wolfe*, and the two *Johnson* cases; in those cases, although the services were being performed by the taxpayers as employees of the U.S. Government, they were being rendered to a foreign government. In this context, the instant case can be distinguished. Nevertheless, we recognize that the thrust of the cases referred to, and, in particular, those in *Mooneyhan* and *Wolfe*, where we were reversed, is that the ultimate "source of funds" is not the controlling factor. We now agree with that view, and so to the extent that our opinions in *Mooneyhan* and *Wolfe* are inconsistent with that thrust, we will no longer follow them.

Petitioner's job is performed for the United States and as a U.S. employee. Indeed, officers of the customs service are attached to the foreign service through the Department of State (see 19 U.S.C. sec. 6, *supra*), and thus they are members of the precise class which Congress sought to address in the statutory exception to section 911(a)(2). See 75 Cong. Rec. 10410, *supra*. Petitioner, therefore, falls within the category of persons excluded from the benefit of section 911(a)(2). That Congress chooses to seek reimbursement from those who benefit from overtime services does not justify a different conclusion. Cf. *Erlandson v. Commissioner, supra* at 73.

Petitioner's second argument is that, if the parenthetical exception to section 911(a)(2) applies to his overtime compensation, then that section violates his constitutional right to equal

---

[6]But see *Krichbaum v. United States, supra*, decided prior to any of the cases cited in the text (employees of Bureau of Public Roads doing construction in Ethiopia may exclude pay under sec. 911(a)(2)).

protection implicit in the due process clause of the Fifth Amendment.[7] See *Bolling v. Sharpe*, 347 U.S. 497 (1954). This argument utterly lacks merit.

A Federal income tax is only limited by the due process clause of the Fifth Amendment in those "rare and special instances" which represent "extreme and glaring" exercises of legislative discretion "fairly outside the zone of possible debate." See *A. Magnano Co. v. Hamilton*, 292 U.S. 40, 44 (1934); *Cohan v. Commissioner*, 39 F.2d 540, 545 (2d Cir. 1930). In the absence of a suspect classification (see *Moritz v. Commissioner*, 469 F.2d 466 (10th Cir. 1972), revg. 55 T.C. 113 (1970)), or a substantial impediment of a fundamental right (see *Johnson v. United States*, 422 F. Supp. 958 (N.D. Ind. 1976), affd. sub nom. *Barter v. United States*, 550 F.2d 1239 (7th Cir. 1977) (per curiam); *Bryant v. Commissioner*, 72 T.C. 757, 765 (1979)), no violation of equal protection is present in a Federal income tax statute so long as there is a conceivably reasonable basis for its classification (*Keller v. Commissioner*, 70 T.C. 279, 284–285 (1978); see *Personnel Admr. v. Feeney*, 442 U.S. 256, 271–273 (1979)). See generally 1 J. Mertens, Law of Federal Income Taxation, sec. 4.09 (1974).

The reasons behind section 911(a) and its exceptions (see pp. 1184–1185 *supra*) are plainly rational and the statute reasonably effectuates them. Accordingly, we hold that section 911(a)(2) is constitutional.

In view of the foregoing, petitioner may not exclude his overtime pay under section 911(a)(2).

*Decisions will be entered for the respondent.*

Reviewed by the Court.

NIMS, *J.*, dissents.

CHABOT, *J.*, concurring: I concur in the result reached by the majority and in most of their analysis. However, I do not believe it is necessary or appropriate to abandon our prior

---

[7]Petitioner mistakenly based his constitutional argument on the equal protection clause of the 14th Amendment, although that amendment is by its own terms only applicable to the States. We have recast petitioner's argument in proper constitutional garb.

general approach, as exemplified by *Mooneyhan v. Commissioner*, 47 T.C. 693 (1967), revd. 404 F.2d 522 (6th Cir. 1968), and *Wolfe v. Commissioner*, 43 T.C. 572 (1965), revd. 361 F.2d 62 (D.C. Cir. 1966).

Section 911(a)(2) excepts from its exclusion "amounts paid by the United States or any agency thereof)." Literally, the amounts in dispute were so paid.

As both the majority and Judge Forrester's dissenting opinion note, the legislative history makes it clear that this exception was enacted by the Congress to apply to U.S. military personnel and to U.S. ambassadors and foreign service personnel. Petitioner-husband's work is in the same category. That is, it is work that can only be done as part of the functioning of the U.S. Government. In this aspect, the instant case is distinguishable from both *Mooneyhan* and *Wolfe*, in which the taxpayers were engaged in highway construction or design. In the latter cases, the taxpayers' employments were outside the fields focused on by the Congress. This Court's analyses in those cases seem to be an appropriate way to deal with the uncertainty as to the outer reaches of the statutory language.

In short, like Judge Forrester, I believe that the *Mooneyhan-Wolfe* approach retains its general usefulness; unlike him, I believe the instant case clearly falls within both the literal language of the statute and the intendment of the Congress, that petitioners are not entitled to the exclusion.

STERRETT, *J.*, agrees with this concurring opinion.

FORRESTER, *J.*, dissenting: I respectfully disagree with the majority which places the petitioner herein within the parenthetical exception of section 911(a)(2) because he earned his overtime salary while acting in his capacity as an employee of the United States. Such a conclusion is not supported by the plain language of that section.

The exception to the general exclusion of section 911(a)(2) applies to "amounts *paid by* the United States or any agency thereof." (Emphasis supplied.) To me, the words "paid by" refer to the source of the funds, which, until now, has been the unwavering position of this Court. This has been so both where

a taxpayer has been employed by the United States and receiving funds, the source of which was without the United States (*Mooneyhan v. Commissioner*, 47 T.C. 693 (1967), revd. 404 F.2d 522 (6th Cir. 1968); *Wolfe v. Commissioner*, 43 T.C. 572 (1965), revd. 361 F.2d 62 (D.C. Cir. 1966)), and where a taxpayer was not employed by the United States, but received funds, the source of which was the United States (*Teskey v. Commissioner*, 30 T.C. 456 (1958)).[1] Section 911(a)(2) by its own terms exempts "amounts received from *sources* without the United States." (Emphasis supplied.) It is only reasonable to interpret the words "paid by" in the parenthetical of that very sentence to refer to the United States as the *source* of the income.

Although it is true that one is usually paid by the individual or entity that employs him, this is not always the case, and the instant litigation presents just such a situation.

It seems that the majority herein would continue to interpret "paid by" to refer to the source of funds where the taxpayer is not employed by the United States (*Teskey v. Commissioner, supra*), but would have those words refer to the taxpayer's employer where that employer is the United States, thus overruling *Mooneyhan v. Commissioner, supra*, and *Wolfe v. Commissioner, supra*. The inconsistency is apparent and makes the section monolithic. Perhaps the majority is not being inconsistent at all, but rather is merely adding another classification to the exception of section 911(a)(2) for "individuals employed by the United States" because that is, they assert, the only reasonable interpretation of that section. In fact, it is entirely unreasonable.

On August 13, 1981, Congress rewrote section 911. See section 111(a) of the Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 172, 190, August 13, 1981, effective for taxable years beginning after December 31, 1981 (hereinafter

---

[1] *Erlandson v. Commissioner*, T.C. Memo. 1958–218, affd. 277 F.2d 70 (9th Cir. 1960). Both *Teskey v. Commissioner*, 30 T.C. 456 (1958), and *Erlandson v. Commissioner, supra*, have been legislatively overruled by sec. 111(a) of the Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 172, 190, Aug. 13, 1981. Effective for taxable years beginning after Dec. 31, 1981, foreign earned income will not include amounts "paid by the United States or an agency thereof *to an employee of the United States or an agency thereof.*" Sec. 911(b)(1)(B)(ii). (Emphasis supplied.) Consequently, amounts paid by the United States to one who is not an employee thereof entitles the payee to the benefits of sec. 911. See H. Rept. 97–215 (Conf.) 204 (1981).

new section 911). The relevant exception to the exclusion from gross income now provides that foreign earned income shall not include amounts "paid by the United States or an agency thereof to an employee of the United States or an agency thereof." Sec. 911(b)(1)(B)(ii). This is a clear expansion of present benefits to any individual who is not both paid by and employed by the United States. H. Rept. 97–201, at 62 (1981); S. Rept. 97–144, at 37 (1981); H. Rept. 97–215 (Conf.), at 204 (1981).

Although new section 911 does not govern the outcome of the instant litigation, it does aid in the interpretation of current law. Under present law, *anyone* "paid by" the United States is denied the benefits of the exclusion. New section 911 limits the scope of "paid by" to *employees of the United States.* See H. Rept. 97–215, *supra.* In both cases, however, the operative element of the exception to benefits is the fact that one be "paid by the United States or an agency thereof." Thus, under new section 911, the question of employment is never addressed until it is determined that one is in fact paid by the United States. This indicates, I submit, that under present section 911(a)(2), the question of employment is merely never addressed. If one is paid by the United States, he is not entitled to the exclusion, and if he is not so paid, he is entitled to the exclusion. One's employment is irrelevant in determining eligibility for the section 911 benefits.

The fact that there is to be a dual requirement of "paid by" and "employed by" as the condition for denial of the earned income exclusion clearly indicates that the current section 911(a)(2) exception for amounts "paid by" does not consider relevant the identity of one's employer as the United States.[2] The majority herein has chosen to entirely ignore the significance of new section 911 as it sheds light on the correct interpretation of current law, i.e., that "paid by" cannot be reasonably interpreted to consider the identity of one's employer.

---

[2]Under sec. 111(a) of the Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 172, 190, Aug. 13, 1981, one paid by the United States and employed by a third party, as well as one paid by a third party but employed by the United States, may be entitled to the foreign earned income exclusion. Clearly, because "paid by" and "employed by" are separate and distinct tests, "paid by" cannot reasonably contemplate one's employment and thus must refer only to the source of one's compensation.

The section 911(a)(2) exclusion was designed specifically as a tax benefit to encourage "managers, technicians, and skilled workers" to go abroad. S. Rept. 781, 82d Cong., 1st Sess. 53 (1951); 1951 C.B. 458, 495, 496. Judge Fahy, dissenting in *Commissioner v. Wolfe, supra,* noted that, notwithstanding that the taxpayer was an employee of the United States and that he could look only to the United States for payment of his salary, section 911(a)(2) looks only to the source of income, not the employer-employee relationship. He suggested that by considering execution and delivery of the salary checks, the majority ignored substance in favor of the form of the transaction. Finally, Judge Fahy took exception with the majority's view of the thrust of the legislative history. He stated (361 F.2d at 69):

> Moreover, legislative history shows that the general exemption was intended to encourage technical personnel to go abroad in furtherance of our political and economic objectives; that is, to encourage a bridge engineer like Mr. Wolfe to accept an assignment in Iran. When the exception "(except amounts paid by the United States or any agency thereof)" was added by the 72d Congress the legislators were focusing on those who were in the service of the United States and were abroad as a regular and ordinary incident of that service, namely, military and diplomatic personnel, not the volunteer who must be induced to go abroad. As Senator Reed said: "I was proposing to tax Americans who I think are unfairly exempted now, like officers of our military service and our Diplomatic Service * * * ." 75 Cong. Rec. 10411 (1932). In adding what is now subsection (a)(2) of Section 911, which is our concern here, the Senate Committee specifically stated that this exemption was meant to encourage technical personnel to agree to work abroad for short periods of time in furtherance of our foreign aid policy: " * * * managers, technicians, and skilled workmen * * * are induced to go abroad for periods of 18 to 36 months to complete specific projects. Your committee believes, in accord with the point 4 program, that it is particularly desirable to encourage men with technical knowledge to go abroad." S. Rep. 781, 82d Cong., 1st Sess. 53 (1951); U.S. Code Congressional and Administrative Service 1951, p. 2024.

> In a lengthy and well-balanced review of the history of the statute up to 1956 the District Court for the Eastern District of Tennessee, in the case of *Krichbaum v. United States, supra,* came to the conclusion reached by the Tax Court in the present case. * * * The court said:

> "If the United States is not the debtor but simply pays the amount which is in fact a debt of another debtor the amount so paid is within the exemption and without the exclusion in the exemption."

> In the several instances in which Congress has amended the statute, three times since *Krichbaum,* no effort appears to have been made to clarify

further the particular problem involved in *Krichbaum* and in our case. Since the problem has had the continuing attention of Congress through the years, it is fair to give some weight to Congressional silence in the face of three other amendments to Section 911 in the nine years since *Krichbaum.*

Absent further Congressional action it seems to me the Tax Court in our case, and the District Court in *Krichbaum*, reached the correct decision * * *

Moreover, to consider relevant, as the majority does, that the petitioner was paid by U.S. Treasury checks, and that he could look only to the United States in case of nonpayment, ignores the fundamental principle of Federal tax law that courts will not permit the form of a transaction to belie its substance. *Weiss v. Stearn*, 265 U.S. 242 (1924); *Commissioner v. Wolfe, supra* at 69. The provisions of 19 U.S.C., sections 267 and 1451 (1976) leave no room for doubt that the United States is a mere conduit for overtime pay of customs employees in situations such as those presented herein. Moreover, the risk of nonpayment referred to by the majority is nonexistent for all practical purposes. Section 1451 of title 19 of the U.S. Code provides that: "*Before* any such special license to unlade shall be granted * * * [the prospective licensee] shall be *required* to deposit sufficient money to pay, or to give a bond * * * conditioned to pay." (Emphasis supplied.) Thus, technically, the airline does not reimburse the United States, but it pays in advance for the services. Additionally, in the case of a bond, both the airline and the bonding company would have to become insolvent before the Government's risk from nonpayment materialized. I submit that such a possibility is extremely remote.

Finally, I would like to address the majority's position that *Mooneyhan* and *Wolfe* can be distinguished from the instant case. While it may be that petitioner herein was performing an "intrinsically governmental function" performed "exclusively under government auspices," as opposed to performing services for a foreign government, the distinction is without relevance. To suggest that the nature of the service performed determines the definition of the words "paid *by*" is pure sophistry. "Paid by" is a phrase referring to the one who pays. "Paid *for*" is a phrase one would use to refer to the reason for payment. This latter phrase does not appear in section 911(a)(2) and there is no reason for this Court to write it into that section.

Furthermore, because of the statutory requirements of 19 U.S.C. secs. 267 and 1451 (1976), the instant case presents an even stronger case than *Mooneyhan v. Commissioner, supra,* and *Wolfe v. Commissioner, supra,* both of which relied merely on international agreements to determine the identity of the actual payor. Moreover, we can think of no valid reason why the mandate of 19 U.S.C. secs. 267 and 1451 (1976), that a customs agent's overtime be "paid by" the airline, should be ignored by the majority in their interpretation of identical words within the exception of section 911(a)(2).

Applying the reasoning of our prior cases, I would conclude that the petitioner in the instant case was not "paid by" the United States or any agency thereof, but was in fact "paid by" the airlines.

Scott, Simpson, Goffe, Hall,* Wiles, and Ekman, *JJ.,* agree with this dissenting opinion.